1  H. PAUL BRYANT, State Bar No. 126037
   LAW OFFICES OF H. PAUL BRYANT
2  725 Washington Street, Suite 725
   Oakland, California, 94607
3  Tel: (510) 272-0700 Fax: (510) 272-0776
   Email: eastbaylaw@aol.com
4
5  Attorney for Unicorn Pan Asian Cuisine

6

7              UNITED STATES DISTRICT COURT

8            NORTHERN DISTRICT OF CALIFORNIA

9               SAN FRANCISCO DIVISION

10

11  CRAIG YATES, an individual; and          )  CASE NO. C080356 JSW
    DISABILITY RIGHTS,ENFORCEMENT,           )
12  EDUCATION, SERVICES: HELPING             )  REQUEST FOR JUDICIAL NOTICE IN
13  YOU HELP OTHERS, a California public      )  SUPPORT OF MOTION FOR COURT
    benefit corporation,                     )  TO: (1) DECLINE SUPPLEMENTAL
14                                           )  JURISDICTION OVER AND TO
                                             )  DISMISS PLAINTIFF'S STATE LAW
15              Plaintiff                     )  CLAIMS [28 U.S.C. § 1367(c)]; AND (2)
                                             )  DISMISS FOR FAILURE TO STATE
16  vs.                                      )  A CLAIM UPON WHICH RELIEF
17                                           )  CAN BE GRANTED; [FRCP 12(b)(6)]
    UNICORN PAN ASIAN CUISINE                )
18  CROKET NATIONAL BANK &                   )
    HENRY I. POPPIC, trustees of the         )  Date:  May 23, 2008
19  POPPIC TRUST and CHAMPANGO               )  Time:  9:00 a.m.
    LLC, a limited liability Company            Courtroom 2, 17th floor
20                                              Judge: The Hon. Jeffrey S. White
21              Defendants.
                                                Complaint filed:  January 18, 2008
22                                              Trial Date:        None
23  _____

24  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

25  Pursuant to Federal Rule of Evidence 201, Defendant Unicorn Pan Asian Cuisine ("Unicorn") (

26  "Moving Party") hereby submits the following Request for Judicial Notice in Support of Motion for

27  the Court to Decline Supplemental Jurisdiction Over and to Dismiss Plaintiff's State Law Claims [28

28  U.S.C. § 1367(c)] and to Dismiss Plaintiff's Complaint for Failing to State a Cause of Action.

                                          1

A. Moving Party hereby requests that the Court take judicial notice of the US. Party Case Index for Craig Yates. Attached hereto as Exhibit A, is a true and correct copy of the online report for this search.

B. Moving Party hereby requests that the Court take judicial notice of the February 7, 2008 decision of the United States District Court for the Northern District of California in Yates v. Union Square, 07CV07087(JSW), a true and correct copy of which is attached hereto as Exhibit B.

C. Moving Party hereby requests that the Court take judicial notice of the January 17, 2007, denial of the California Supreme Court of the petition for review of plaintiff/appellant David Gunther of the decision of Gunther v. Lin, 144 Cal.App.4th 223 (4th Dist. 2006). Attached hereto as Exhibit C is a true and correct copy of the case and online register of actions for this petition.

D. Moving Party hereby requests that the Court take judicial notice of the decision of the United States District Court for the Southern District of California in Cross v. Pacific Coast Plaza Invest., No. 06CV2543 JM(RBB) (SD Cal. Mar. 6, 2007), a true and correct copy of which is attached hereto as Exhibit D.

E. Moving Party hereby requests that the Court take judicial notice of the March 22, 2007 decision of the United States District Court for the Eastern District of California in Wilson v. Haria and Gogri Corp., 2007 WL 851744 (ED Cal. 2007), a true and correct copy of which is attached hereto as Exhibit E.

F. Moving Party hereby requests that the Court take judicial notice of the May 29, 2007 decision of the United States District Court for the Southern District of California in Cross v. Boston Market Corp., 07CV486J(LSP), a true and correct copy of which is attached hereto as Exhibit F.

Dated: March 31, 2008

LAW OFFICES OF H. PAUL BRYANT

By: _____
H. Paul Bryant, Attorney for
Unicorn Pan Asian Cuisine

REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR
THE COURT TO (1) DECLINE SUPPLEMENTAL JURISDICTION AND
(2) DISMISS FOR FAILURE TO STATE A CAUSE OF ACTION UPON
WHICH RELIEF CAN BE GRANTED
Case # C08-0356

2

Exhibit A

Case 3:08-cv-00356-JSW    Document 12    Filed 03/31/2008    Page 4 of 88
https://pacer.uspci.uscourts.gov/cgi-bin/dquery.pl

# U.S. Party/Case Index

## Civil Name Search Results

**28 Total Party matches for selection YATES, CRAIG 01/01/2000 to 03/25/2008 for CALIFORNIA**

Search Complete

Tue Mar 25 16:36:30 2008

Selections 1 through 28 (Page 1)

●Download (1 pages $ 0.00)

| | Name | Court | Case No. | Filed | NOS | Closed |
|---|---|---|---|---|---|---|
| 1 | YATES, CRAIG | candce | 3:2008cv00356 | 01/18/2008 | 446 | |
| | Yates et al v. Unicorn Pan Asian Cuisine et al | | | | | |
| 2 | YATES, CRAIG | candce | 3:2007cv00460 | 01/23/2007 | 440 | 01/02/2008 |
| | Yates et al v. Petco Animal Supplies Stores, Inc. | | | | | |
| 3 | YATES, CRAIG | candce | 3:2008cv00737 | 01/31/2008 | 446 | |
| | Yates et al v. Burger King #3157 et al | | | | | |
| 4 | YATES, CRAIG | candce | 3:2007cv00946 | 02/14/2007 | 440 | |
| | Yates et al v. Celia's Restaurants Corporation et al | | | | | |
| 5 | YATES, CRAIG | candce | 3:2007cv01250 | 03/02/2007 | 446 | |
| | Connally et al v. USA Smog & Gasoline et al | | | | | |
| 6 | YATES, CRAIG | candce | 3:2007cv01403 | 03/09/2007 | 446 | 03/06/2008 |
| | Yates et al v. New Tin's Market et al | | | | | |
| 7 | YATES, CRAIG | candce | 3:2007cv01405 | 03/09/2007 | 446 | 03/04/2008 |
| | Yates et al v. Belli Deli et al | | | | | |
| 8 | YATES, CRAIG | candce | 3:2007cv01566 | 03/19/2007 | 446 | 08/28/2007 |
| | Yates et al v. The Cheese Steak Shop Inc. et al | | | | | |
| 9 | YATES, CRAIG | candce | 3:2007cv02100 | 04/13/2007 | 440 | |
| | Yates et al v. Foster Freeze Berkeley et al | | | | | |
| 10 | YATES, CRAIG | candce | 3:2007cv02525 | 05/11/2007 | 446 | |
| | Yates et al v. D & A Cafe Inc et al | | | | | |
| 11 | YATES, CRAIG | candce | 3:2007cv02657 | 05/18/2007 | 446 | |
| | Yates et al v. Winter Properties et al | | | | | |
| 12 | YATES, CRAIG | candce | 3:2007cv03033 | 06/12/2007 | 446 | |
| | Yates et al v. El Sombrero et al | | | | | |
| 13 | YATES, CRAIG | candce | 3:2006cv03289 | 05/18/2006 | 440 | |
| | Jankey et al v. Ted's Sport Bar & Grill et al | | | | | |
| 14 | YATES, CRAIG | candce | 3:2007cv03326 | 06/25/2007 | 446 | 12/27/2007 |

Yates et al v. Bimbo Bakeries USA, Inc. et al

15 YATES, CRAIG          candce  3:2005cv03610  09/07/2005  446  09/01/2006

Yates et al v. Woodside Office Center, L.L.C. et al

16 YATES, CRAIG          candce  4:2007cv03685  07/17/2007  446

Kirola et al v. City & County of San Francisco et al

17 YATES, CRAIG          candce  4:2007cv03889  07/30/2007  445

Yates et al v. Lotus Cuisine of India et al

18 YATES, CRAIG          candce  3:2007cv04087  08/09/2007  446

Yates v. Union Square et al

19 YATES, CRAIG          candce  3:2007cv04177  08/14/2007  446

Yates et al v. Discount Alley Inc. et al

20 YATES, CRAIG          candce  3:2004cv04308  10/12/2004  440  06/30/2005

Yates et al v. Associated Main Street Partners, et al

21 YATES, CRAIG          candce  3:2007cv04395  08/24/2007  446

Yates et al v. Red's Recovery Room Inc. et al

22 YATES, CRAIG          candce  3:2004cv05087  12/01/2004  440  05/13/2005

Yates et al v. Nicolai Building et al

23 YATES, CRAIG          candce  3:2004cv05211  12/09/2004  440  09/14/2005

Yates et al v. Heller's For Children Inc. et al

24 YATES, CRAIG          candce  3:2007cv05485  10/26/2007  446

Yates et al v. N-O-H-R Plaza et al

25 YATES, CRAIG          candce  3:2007cv06498  12/28/2007  446

Yates et al v. Levin Commercial Facility et al

26 YATES, CRAIG          candce  3:2006cv06577  10/20/2006  440  08/16/2007

Connally et al v. Sol Food et al

27 YATES, CRAIG          candce  3:2006cv07917  12/27/2006  440  01/17/2008

Yates et al v. Napa Valley Casino et al

28 YATES, CRAIG THOMAS  candce  3:2002cv05849  12/17/2002  440

Moeller et al v. Taco Bell Corp.

## PACER Service Center

### Transaction Receipt

03/25/2008 16:36:30

| PACER Login: | pb2134 | Client Code: | |
|---|---|---|---|
| Description: | Civil srch pg 1 | Search Criteria: | YATES, CRAIG 01/01/2000 to 03/25/2008 |
| Billable Pages: | 1 | Cost: | 0.08 |

Exhibit B

United States District Court
For the Northern District of California

1
2
3
4
5
6
7          IN THE UNITED STATES DISTRICT COURT
8
          FOR THE NORTHERN DISTRICT OF CALIFORNIA
9
10   CRAIG YATES,
11              Plaintiff,                      No. C 07-04087 JSW
12        v.
13   UNION SQUARE; CITY AND COUNTY OF          **ORDER GRANTING MOTION TO**
     SAN FRANCISCO; CITY OF SAN               **DECLINE SUPPLEMENTAL**
14   FRANCISCO UPTOWN PARKING                 **JURISDICTION AND TO DISMISS**
     CORPORATION; EMPORIO RULLI IL            **STATE LAW CLAIMS AND**
15   CAFFE UNION SQ.; EMPORIO RULLI IL        **DENYING PART AND**
     CAFFE UNION SQ., INC.; and DOES 1        **GRANTING IN PART MOTION**
16   through 50, inclusive,                   **TO STRIKE PLAINTIFF'S**
                                              **DAMAGES PRAYERS**
17              Defendants.
                                    /
18
19        Now before the Court is the motion filed by Defendants City and County of San

20   Francisco ("CCSF") and City of San Francisco Uptown Parking Corporation ("Uptown")

21   (collectively "Moving Defendants") for the Court to decline supplemental jurisdiction over and

22   to dismiss Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c) and to strike Plaintiff's

23   improper damages prayers from the complaint. The Court finds that this matter is appropriate

24   for disposition without oral argument. *See* N.D. Civ. L.R. 7-1(b). Accordingly, the hearing set

25   for February 8, 2008 is HEREBY VACATED. Having considered the parties' pleadings and

26   the relevant legal authority, the Court HEREBY GRANTS the motion to dismiss the state law

27   claims and DENIES IN PART and GRANTS IN PART the motion to strike portions of the

28   damage prayers.

**United States District Court**
For the Northern District of California

**BACKGROUND**

According to the Complaint, Plaintiff Craig Yates, is a person with physical disabilities and utilizes a wheelchair for mobility. (Compl., ¶ 1.) He files this lawsuit on behalf of himself and other, similarly situated persons with disabilities, against the operators and owners of the City's newly renovated Union Square. Plaintiff alleges that he has been discriminated against on the basis of his disability as the result of architectural access barriers such as failure to provide a safe and accessible path of travel from the southern boundary to the square; failure to provide safe and accessible high-top van parking facilities fully complying with the requirements of the code; failure to provide an accessible and safe path of travel for use by persons with disabilities from the public parking area to the square, including accessible ramp facilities; failure to provide open and accessible ticket payment facilities; failure to provide accessible service and condiment counter; and failure to modify, draft or implement policies, practices and procedures, and to provide adequate training and information to staff, so as to maintain accessible parking facilities and their availability, or otherwise provide access through reasonable alternative accommodations and methods. (*Id.*, ¶ 13.)

Plaintiff alleges that Moving Defendants have intentionally maintained the subject property in its current non-compliant condition, and has intentionally refrained from altering the subject property so that it complies with accessibility standards. (*Id.*, ¶¶ 15, 27.) Plaintiff states ten causes of action for relief for various violations of the Americans with Disabilities Act of 1990 ("ADA"), violation of Section 504 of the Rehabilitation Act of 1973, denial of full and equal access in violation of California Heath & Safety Code sections 19955, *et seq.*, violation of California Government Code sections 4450, *et seq.*, violation of California Civil Code sections 55, 54.1 and 55, violation of the Unruh Civil Rights Act section 51(f), violation of California Government Code section 11135 and a cause of action for declaratory relief.

Moving Defendants bring a motion for the Court to decline supplemental jurisdiction over and to dismiss Plaintiff's state law claims as well as a motion to strike certain damage prayers from the complaint.

2

<div style="text-align:left">United States District Court<br>For the Northern District of California</div>

## ANALYSIS

**A.    Motion for Court to Decline Supplemental Jurisdiction Over State Law Claims.**

Plaintiff's state law claims are so related to the ADA claims that the Court finds that they form a part of the same case or controversy. Therefore, the Court can properly exercise supplemental jurisdiction under 28 U.S.C. § 1367(a). However, once the Court acquires supplemental jurisdiction over state law claims, section 1367(c) provides the only valid bases upon which it may, in its discretion, decline to exercise it. *Executive Software N. Am., Inc. v. Jensen*, 24 F.3d 1545, 1551 (9th Cir. 1994). Section 1367(c) provides:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if –
> > (1) the claim raises a novel or complex issue of State law,
> > (2) the claims substantially predominates over the claims or claims over which the district court has original jurisdiction,
> > (3) the district court has dismissed all claims over which it has original jurisdiction, or
> > (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Moving Defendants request that the Court decline supplemental jurisdiction over the California state law claims by arguing that California law regarding damages permissible under the Unruh Act is unsettled because of a conflict between the California Court of Appeal decision in *Gunther v. Lin*, 144 Cal. App. 4th 223, 231-32 (2006), and the Ninth Circuit's holding in *Lentini v. Cal. Center for the Arts*, 370 F.3d 837, 846-47 (9th Cir. 2004).

Under Title III of the ADA, plaintiffs need not establish discriminatory intent to obtain injunctive relief. Pursuant to California Civil Code section 51(f), a violation of the ADA automatically qualifies as a violation of the Unruh Act. As a result, in *Lentini*, the Ninth Circuit held that plaintiffs also need not prove discriminatory intent to obtain damages under the California Unruh Act. *Lentini*, 370 F.3d at 846-47. California courts, however, have held that the Unruh Act does requires proof of intentional discrimination before a plaintiff may recover damages. *See Harris v. Capital Growth Investors XIV*, 52 Cal. 3d 1142, 1175 (1991).

In *Gunther*, the California Court of Appeal expressly rejected the Ninth Circuit's decision in *Lentini* and determined that damages for Unruh Act violations under California Civil Code section 52 are not available without proof of intent. *Gunther*, 144 Cal. App. 4th at 232.

<div style="text-align:center">3</div>

<div style="writing-mode: vertical">**United States District Court**<br>For the Northern District of California</div>

1   Faced with this conflicting authority, the majority of district courts in California have concluded

2   that it is appropriate to decline to exercise supplemental jurisdiction. *See Wilson v. Haria and*

3   *Gogri Corp.*, 479 F. Supp. 2d 1127, 1135-141 (E.D. Cal. 2007); *Wilson v. PFS, LLC*, 493 F.

4   Supp. 2d 1122, 1126 (S.D. Cal. 2007); *Simonelli v. University of California-Berkeley*, 2007 WL

5   4165958, *3 (N.D. Cal. Nov. 7, 2007); *Oliver v. GMRI, Inc.*, 2007 WL 41449955, *3 (S.D. Cal.

6   Nov. 19, 2007); *Morgan v. American Stores Co.*, 2007 WL 1971945, *3 (S. D. Cal. June 29,

7   2007); *Pinnock v. Java Depot, Inc.*, 2007 WL 2462106, *5 (S.D. Cal. Aug. 28, 2007); *Pinnock*

8   *v. Safino Designs, Inc.*, 2007 WL 2462107, *5 (S.D. Cal. Aug. 28, 2007); *Cross v. Pac. Coast*

9   *Plaza Invs, L.P.*, 2007 WL 951772, *6 (S.D. Cal. Mar. 6, 2007); *Feezor v. Tesstab Operations*

10  *Group,* Inc., 2007 WL 4410262, *3 (S.D. Cal. Dec. 17, 2007); *but see Johnson v. Barlow*, 2007

11  WL 1723617, *3 (E.D. Cal. June 11, 2007) (finding that court is bound by Ninth Circuit and

12  retaining supplemental jurisdiction); *Pinnock v. Solana Beach Do It Yourself Dog Wash, Inc.*,

13  2007 WL 1989635, *3 (S.D. Cal. July 3, 2007) (exercising supplemental jurisdiction at an early

14  stage in litigation and preserving defendants' rights to renew motion once ADA claim is

15  resolved).

16         This Court finds the reasoning of the majority of judges in the California district courts

17  to be persuasive.  It is for the state courts, not the federal courts, to determine the proper

18  interpretation of the Unruh Act and its effect on Plaintiff's state law claims.  If this Court

19  maintains jurisdiction over Plaintiff's state law claims, the Court will be bound by *Lentini* to

20  allow Plaintiff to recover damages under the Unruh Act without any showing of intentional

21  discrimination.  However, if Plaintiff had filed this case in state court, the state court would be

22  bound by *Gunther* to deny relief unless Plaintiff established intent.

23         Although in this case, Plaintiff has alleged intent, the Court would ultimately have to

24  resolve a novel and complex issue of state law, that is, whether Plaintiff would need to prove

25  intentional discrimination in order to recover under the Unruh Act.  Although it would be more

26  convenient for this lawsuit to be adjudicated in one action, the novelty and complexity of the

27  state law issues weighs in favor of dismissing them to allow California state courts to resolve

28  the issue.  "Needless decisions of state law should be avoided as a matter of comity." *United*

1   *Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  Therefore, this Court declines to exercise

2   supplemental jurisdiction over the Unruh Act claims.  In addition, because Plaintiff's remaining

3   state law claims are intertwined with the Unruh Act claims, the Court also finds it appropriate to

4   dismiss those claims to permit the state court to adjudicate all state law claims together.

5   Plaintiff's state law claims are dismissed without prejudice to being re-filed in state court.

6   **B.      Motion to Strike Improper Damage Prayers from Complaint.**

7           Federal Rule of Civil Procedure 12(f) provides that a court may "order stricken from any

8   pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous

9   matter."  Immaterial matter "is that which has no essential or important relationship to the claim

10  for relief or the defenses being pleaded."  *California Dept. of Toxic Substances Control v.*

11  *ALCO Pacific, Inc.*, 217 F. Supp. 2d 1028, 1032 (C.D. Cal. 2002) (internal citations and

12  quotations omitted).  Impertinent material "consists of statements that do not pertain, or are not

13  necessary to the issues in question."  *Id.* Motions to strike are regarded with disfavor because

14  they are often used as delaying tactics and because of the limited importance of pleadings in

15  federal practice.  *Colaprico v. Sun Microsystems Inc.*, 758 F. Supp. 1335, 1339 (N.D. Cal.

16  1991).  The possibility that issues will be unnecessarily complicated or that superfluous

17  pleadings will cause the trier of fact to draw unwarranted inferences at trial is the type of

18  prejudice that is sufficient to support the granting of a motion to strike.  *Cal. Dept. of Toxic*

19  *Substances Control*, 217 F. Supp. at 1028.

20          Moving Defendants contend that Plaintiff has failed properly to allege intentional

21  discrimination and is therefore not entitled to seek damages under Title II of the ADA or

22  Section 504 of the Rehabilitation Act.  *See Lovell v. Chandler*, 303 F.3d 1039, 1056 (9th Cir.

23  2002) (holding that, at trial, Plaintiff must establish facts demonstrating "deliberate

24  indifference" which requires that a plaintiff demonstrate that defendant had knowledge that

25  harm to a federally protected right in likely and the defendant's failure to act on that likelihood;

26  *see also Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999)

27  (holding that same standard applies to Section 504 claims).  The Court finds that, at this

28  procedural stage, Plaintiff makes out sufficient allegations of intentional discrimination.

United States District Court
For the Northern District of California

1  (*See* Compl., ¶¶ 15, 27.) Therefore, Moving Defendants' motion to strike the prayer for

2  damages for violations of Title II of the ADA and Section 504 of the Rehabilitation Act is

3  DENIED.

4      Next, Moving Defendants contends that the Court should strike Plaintiff's request for

5  attorneys' fees and litigation costs under California Code of Civil Procedure § 1021.5. The

6  California Code of Civil Procedure § 1021.5 permits an award of attorney fees to a prevailing

7  party in an action under California state law when "the litigation enforced an important right

8  affecting the public interest, ... a significant benefit was conferred on a large class of persons,

9  and ... the necessity and financial burden are such that an award of attorney's fees is

10 appropriate." *In re County of Monterey Initiative Matter*, 2007 WL 3342796, *3 (N.D. Cal.

11 Nov. 9, 2007) (citing *Keith v. Volpe*, 858 F.2d 467, 486 (9th Cir. 1988)). Because the Court has

12 dismissed the state causes of action, the Court may not grant an award of attorneys' fees under

13 the California provision. Therefore, Moving Defendants' motion to strike the request for

14 attorneys' fees and litigation costs under California Code of Civil Procedure § 1021.5 is

15 GRANTED.

16                                          **CONCLUSION**

17      For the foregoing reasons, the Court GRANTS Moving Defendants' motion for the

18 Court to decline supplemental jurisdiction over the state law claims and DENIES IN PART and

19 GRANTS IN PART Moving Defendants' motion to strike. Plaintiff shall have until February

20 29, 2008 to file an amended complaint in compliance with this order. Failure to amend shall

21 result in the operative complaint being the one on file, subject to the Court's order.

22     **IT IS SO ORDERED.**

23

24 Dated:  February 7, 2008

25                                          JEFFREY S. WHITE
                                            UNITED STATES DISTRICT JUDGE

26

27

28

*United States District Court*
*For the Northern District of California*

6

Exhibit C

# CALIFORNIA APPELLATE COURTS

### Case Information



| | |
|---|---|
| **Supreme** Court | ## Supreme Court |

Change court

**Welcome**

**Search**    Court data last updated: 03/31/2008 10:54 AM

**E-mail**

**Case Summary**   **Docket**   **Briefs**
**Disposition**   **Parties and Attorneys**   **Lower Court**

**Calendar**

**Help**    ## Disposition

**Opinions**    **GUNTHER v. LIN**
**Case Number S148359**

C|C
home

Only the following dispositions are displayed below: Orders Denying Petitions, Orders Granting Rehearing and Opinions. Go to the Docket Entries screen for information regarding orders granting review.

**Case Citation: none**

| Date | Description |
|---|---|
| 01/17/2007 | Petition and Depub. request(s) denied |

**Click here** to request automatic e-mail notifications about this case.

© 2007 Judicial Council of California

| Supreme Court | **Supreme Court** | | Change court ▲ |

| Welcome | |
| Search | Court data last updated: 03/31/2008 10:54 AM |
| E-mail | **Case Summary   Docket   Briefs** |
| Calendar | **Disposition   Parties and Attorneys   Lower Court** |
| Help |
| Opinions |

## Docket (Register of Actions)

**GUNTHER v. LIN**
**Case Number S148359**

| Date | Description | Notes |
|------|-------------|-------|
| 11/28/2006 | Request for depublication filed (initial case event) | Protection & Advocacy, Inc. , Legal Aid Society - Employment Law Center, Disability Rights Legal Center, and Californians for Disability Rights (non-parties) by Ann Esther Menasche, retained counsel [Amici in the court of the appeal ] |
| 11/28/2006 | Request for depublication filed (another request pending) | The Impact fund and Disability Rights Advocates by Brad Stuart Seligman, retained counsel. [ Proof of service forthcoming ] Proof of service received 11-30-2006 |
| 11/30/2006 | Petition for review filed (after previous pub/depub request) | David Gunther, appellant Morse Mehrban, counsel |
| 11/30/2006 | Record requested | |
| 12/04/2006 | Received Court of Appeal record | one file folder/briefs/transcript |
| 12/05/2006 | Received: | letter dated December 1, 2006 from appellants counsel Morse Mehrban. |
| 01/03/2007 | Opposition filed | Respondent, Lin, to depublication request filed by Protection and Advocacy. by counsel, Michael D. Murphy. |
| 01/17/2007 | Petition for review & depublication request(s) denied | Moreno, J., was absent and did not participate. |

**Click here to request automatic e-mail notifications about this case.**

© 2007 Judicial Council of California

1 of 1 DOCUMENT

**DAVID GUNTHER, Plaintiff and Appellant, v. JOHN LIN, Defendant and Respondent.**

**G036042**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

*144 Cal. App. 4th 223; 50 Cal. Rptr. 3d 317; 2006 Cal. App. LEXIS 1670; 2006 Cal. Daily Op. Service 10048; 2006 Daily Journal DAR 14326; 12 Accom. Disabilities Dec. (CCH) P12-199*

**October 26, 2006, Filed**

**SUBSEQUENT HISTORY:** Review denied by, Request denied by *Gunther v. Lin,* 2007 Cal. LEXIS 350 (Cal., Jan. 17, 2007)

**PRIOR-HISTORY:**    Superior Court of Orange County, No. 04CC07448, Jane D. Myers, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.)

**COUNSEL:** Law Offices of Morse Mehrban and Morse Mehrban for Plaintiff and Appellant.

Mohajerian Law Corporation and Al Mohajerian for Defendant and Respondent.

**JUDGES:** Sills, P. J., with Rylaarsdam and Aronson, JJ., concurring.

**OPINION BY:** Sills

**OPINION**

SILLS, P. J.--

I. LEGAL BACKGROUND LEADING TO THIS CASE

In 1991--and the year is important as we shall later explain--our Supreme Court issued its opinion in *Harris v. Capital Growth Investors XIV (1991) 52 Cal.3d 1142 [278 Cal. Rptr. 614, 805 P.2d 873]* (*Harris*), which, among other things, judicially construed the triggering language of *section 52 of the Civil Code.* Strictly speaking, *section 52* is not part of California's Unruh Civil Rights Act, which by its terms refers only to *section*

*51 of the Civil Code* (*Gatto v. County of Sonoma (2002) 98 Cal.App.4th 744, 757 [120 Cal. Rptr. 2d 550]* ["By its own terms, the Unruh Civil Rights Act comprises *only section 51.*"]), though it provides for certain remedies for discrimination in violation of the Unruh Civil Rights Act.

According to the state Supreme Court, the language in *section 52* "reveals a desire to punish intentional and morally offensive conduct." (*Harris, supra, 52 Cal.3d at p. 1172.*) [1] The *Harris* court thus rejected an interpretation of *section 52* [2] that would have applied *section 52* to a policy of landlords (requiring minimum incomes of three times a month's rent) that assertedly had a disparate impact on women, even though the landlords had no intent to discriminate against women. (See *Harris, supra, 52 Cal.3d at pp. 1170-1175*; see particularly *id. at p. 1175* ["In summary, we hold that a plaintiff seeking to establish a case under the Unruh Act must plead and prove intentional discrimination in public accommodations in violation of the terms of the Act. A disparate impact analysis or test does not apply to Unruh Act claims."].)

[1]    To quote *Civil Code section 52* from the *Harris* decision, and the italicized words and ellipses are original to the *Harris* decision, not our own: " 'Whoever *denies,* or who *aids,* or *incites* such denial, or whoever *makes any discrimination,* distinction, or restriction on account of sex, color, race ... contrary to the provisions of *Section 51* ... , is liable for each and every such *offense* for the actual damages, *and* such amount as may be determined by a jury, or a

court sitting without a jury, *up to a maximum of three times the amount of actual damage* but in no case less than two hundred fifty dollars ($ 250), and such attorney's fees as may be determined by the court in addition thereto, suffered by any person denied the rights provided in *Section 51 ... .' "* (*Harris, supra, 52 Cal.3d at p. 1172,* italics and ellipses in original.) The only change in the quoted language since the *Harris* decision was that "discrimination, distinction or restriction on account of" followed by a listing of categories of sex, color race et cetera "contrary to the provisions of *Section 51*" became, simply, "discrimination or distinction contrary to *Section 51.*" The change, as we explain anon, was intended to broaden the categories of persons who might sue under *section 52* to include disabled persons (hence the dispensing of such specific categories as sex, color and race), but otherwise did not touch the emphasized words and phrases that the *Harris* court had construed to contemplate intentional discrimination, i.e., "denies" "aids or incites a denial" "makes any discrimination" and "offense" remain the same today as they did when *Harris* was decided. In 1994 the minimum $ 250 penalty in *section 52* at the time of the 1991 *Harris* decision was increased to $ 1,000 (see Stats. 1994, ch. 535, § 3, p. 2761), and in 2001 it was increased again to its current $ 4,000 (Stats. 2001, ch. 261, § 1).

2    All statutory references in this opinion are to the Civil Code unless otherwise specifically designated.

More than one year later, in 1992, Governor Wilson signed legislation (known as Assembly Bill No. 1077) which added this language to *section 51:* "A violation of the right of any individual under the Americans with Disabilities Act of 1990 (Public Law 101-336) shall also constitute a violation of this section," that is, *section 51.* (These words would later be recodified as *subdivision (f) of section 51,* which is how, for reader convenience, we will refer to them in this opinion.)

The new legislation did *not* change the language in *section 52* which the *Harris* case had interpreted. (And, to get ahead of ourselves for a moment, as we explain below, a review of the legislative history of the 1992 legislation reveals no intention to change the *Harris* decision.)

The Americans with Disabilities Act of 1990, commonly known as the ADA, contains provisions which, of course, prevent intentional discrimination against disabled individuals and provides for compensatory awards for such discrimination. (See, e.g., *42 U.S.C. § 12112(a)* [employers may not "discriminate against a qualified individual with a disability"]; *Buie v. Quad/Graphics, Inc. (7th Cir. 2004) 366 F.3d 496, 503* [noting possibility of proving discrimination by either "direct" or "indirect" method]; *Griffin v. Steeltek, Inc. (10th Cir. 2001) 261 F.3d 1026, 1028-1029* [noting possibility of compensatory damages under the ADA if plaintiff establishes that employer " 'engaged in unlawful intentional discrimination' "].)

In enacting the ADA, Congress also contemplated architectural regulations, or "design standards," which would be promulgated by the executive branch of the federal government to facilitate the equal access of disabled individuals to public accommodations, such as restaurants. One federal court summarized Congress' approach this way: "In drafting Title III of the ADA, Congress painted with a broad brush and then directed the Attorney General to promulgate regulations to implement the law. ... Those regulations were to include design standards, which must be 'consistent with the minimum guidelines and requirements issued by the Architectural and Transportation Barriers Compliance Board,' commonly referred to as the 'Access Board.' " (*Independent Living Resources v. Oregon Arena Corp. (D.Oregon 1997) 982 F. Supp. 698, 707-708* (hereinafter *Independent Living I*).) [3]

3    The *Independent Living* case basically concerned a multitude of architectural issues that arose out of the building the arena for the Portland Trail Blazers. The opinion is so long that it begins, like a long law review article, with a formal table of contents.

The architectural regulations or "design standards" implemented by the federal ADA are often referred to in the literature as "ADAAG's," which is an acronym for "ADA Architectural Guidelines." (See *Independent Living I, supra, 982 F. Supp. at pp. 707-708* ["The guidelines issued by the Access Board are denominated the 'ADA Accessibility Guidelines' ('ADAAG.') The design standards enacted by the Attorney General are identical to the ADAAGs, but are denominated as 'Standards.' Despite the technical distinction, the two

terms are often used interchangeably."]; *Access Now v. Ambulatory Surgery Center Group Ltd. (S.D.Fla. 2001) 146 F. Supp. 2d 1334, 1336* ["These guidelines are called ... ('ADAAG') ... ."].) The "ADAAG's" are found in appendix A to part 36 of title 28 of the Code of Federal Regulations. [4]

   [4]    The proper formal citation to a particular guideline under our state's style manual would be "28 Code of Federal Regulations part 36, Appendix A, standard" followed by the numerical designation, e.g., 28 Code of Federal Regulations part 36, Appendix A, Standard 4.13. Federal courts tend to use either "Standard" or the more exotic acronym "ADAAG" in referring to the various guidelines, but our rough measure search suggests that the majority of federal courts, when they have occasion, refer to the guidelines generally as ADAAG's and particular guidelines as "ADAAG" followed by the numerical designation. (E.g., *Access Now v. Ambulatory Surgery Center Group Ltd., supra, 146 F. Supp. 2d at p. 1337* ["As stated explicitly in ADAAG 4.1.3(14) ... ."].) Accordingly, we will follow suit and hereafter refer to particular guidelines by citing to "ADAAG" and then the number of the particular guideline.

   Some of the ADAAG's are basically so intuitive and obvious--such as requiring the doors to at least one stall in a public restroom to be wide enough to allow a wheelchair to pass through [5]--that it would be hard to believe that noncompliance with them could be other than intentional. [6] Other ADAAG's, however, do not implicate any intentional conduct at all, such as the requirement that the pipes underneath the sink in a public restroom be wrapped with insulation, [7] or the remarkable requirement that any visual alarms be *exactly* 80 inches above the highest floor level within the space or *exactly* six inches below the ceiling, whatever is lower. [8] For example, a customer using a wheelchair who entered a public restroom before a contractor had finished working on a remodel of it and had gotten around to wrapping insulation on the pipes under the sink would find a restroom in "violation" of the ADA even though the owner was remodeling the restroom precisely in order to ensure that wheelchair customers had equal access to its toilet facilities.

   [5]    See ADAAG 4.13 and ADAAG 4.17.5

(minimum clearances for toilet stall doors).

   [6]    While there is the possibility that a given architectural modification might not be "readily achievable" within the meaning of *42 United States Code section 12182(b)(2)(A)(iv)*, it should be equally clear that in certain cases, such as new construction or remodeling, a failure to provide for sufficient space for toilet stalls would be so obvious as to implicate at least a prima facie case of discriminatory intent.

   [7]    ADAAG 4.19.4.

   [8]    ADAAG 4.28.3(6). See also ADAAG 3.1 ("Dimensions that are not marked minimum or maximum are absolute, unless otherwise indicated in the text or captions"). Though another ADAAG states that, "All dimensions are subject to conventional building industry tolerances for field conditions" (ADAAG 3.2), that possibility only confirms the ease by which the ADAAG's can be violated unintentionally.

   It is, in fact, very easy to violate one of the ADAAG's inadvertently, even if one has the best of intentions. For example, one federal case, *Torres v. Rite Aid Corp. (N.D.Cal. 2006) 412 F. Supp. 2d 1025*, even held that one defendant's reliance on the United States Department of Justice's Title III Technical Assistance Manual was insufficient because there was a technical conflict with what the manual said and the promulgated regulations--ironically issued by the Department of Justice itself. [9]

   [9]    The manual, in addressing the topic of objects that might protrude into the aisles of a store, plainly stated: " '[o]nly equipment that is fixed or built in to the facility, is covered by the accessibility standards ... .' " (*Torres v. Rite Aid Corp., supra, 412 F. Supp. 2d at p. 1032*, citing Dept. of Justice, Title III Technical Assistance Manual, pt. 5.3000 (1994).) But that didn't help a drugstore in a case involving plastic cardboard advertising signs and other "moveable, protruding objects" in aisles. (See *412 F.Supp. at p. 1029*.) Because the Department of Justice's manual conflicted with its own regulations, the drugstore could not get summary judgment on that basis. The drugstore even had a letter from a Department of Justice official stating that regulations covered only fixed building elements, and of course that was insufficient as well. (See *id*

*. at pp. 1032-1033.*)

Thus it is not surprising that a number of courts have noted that there can be "violations" of the ADA--that is, noncompliance with certain ADAAG's and other ADA regulations--by even the best-intentioned property owners. (See *Fell v. Spokane Transit Auth. (1996) 128 Wn. 2d 618, 628 [911 P.2d 1319]* ["ADA's protection is not even conditioned upon a finding of 'discrimination'... ."]; *Independent Living I, supra, 982 F. Supp. at p. 707* ["With limited exceptions, the defendant's mental state has little bearing upon whether the Rose Garden [the indoor sports stadium alleged to be noncompliant] complies with the requirements of Title III of the ADA, at least in an action commenced by a private party."]; *Helen L. v. DiDario (3d Cir. 1995) 46 F.3d 325, 335* ["Because the ADA evolved from an attempt to remedy the effects of 'benign neglect' resulting from the 'invisibility' of the disabled, Congress could not have intended to limit the Act's protections and prohibitions to circumstances involving deliberate discrimination. Such discrimination arises from 'affirmative animus' which was not the focus of the ADA or *section 504* [of the Rehabilitation Act of 1973]."].)

And it was precisely because it was so easy for businesspeople--particularly small businesspeople--to inadvertently violate the ADA that Congress limited the circumstances under which they might be sued for such a technical violation. Under the ADA, a private individual suing a businessperson has *no* right to damages absent intentional discrimination. [10] Under such circumstances, the most a private person can obtain are the attorney fees incurred in an action to force the businessperson into compliance. (*Boemio v. Love's Restaurant (S.D.Cal. 1997) 954 F. Supp. 204, 207* ["Monetary damages are not recoverable by private Plaintiffs under the ADA."]; *Independent Living I, supra, 982 F. Supp. at p. 771* ["A private litigant may obtain injunctive relief and recover attorney fees under this subchapter, but is not entitled to recover compensatory or punitive damages on such claim."]; see also *American Bus Ass'n v. Slater (2000) 343 U.S. App.D.C. 367 [231 F.3d 1, 5]* ["By specifying the circumstances under which monetary relief will be available, Congress evinced its intent that damages would be available in no others."]; McCabe, *California Disability Anti-Discrimination Law: Lighthouse in the Storm or Hunt for Buried Treasure?* (2005) 36 McGeorge L.Rev. 661, 662 ["suits arising under federal law permit private plaintiffs to obtain only injunctive relief," citing

*42 U.S.C. §§ 2000a-3(a) & 12188(a)(1)*].)

10    Cases where plaintiffs recover money damages for intentional discrimination of the ADA are often *employment* cases. Even in those cases, however, it is sometimes very easy for employers to technically violate the ADA without intentionally discriminating. (See *Griffin v. Steeltek, supra, 261 F.3d at pp. 1028-1029* ["Compensatory damages are available under the ADA, however, only if the plaintiff establishes that the employer not only technically violated § 12112(d)(2)(A) by asking a prohibited question, but also that by doing so it actually 'engaged in unlawful intentional discrimination.' "]; see, e.g., *Gonzales v. Sandoval County (D.N.M. 1998) 2 F. Supp. 2d 1442, 1443-1444, 1448* [leaving jury award of $ 50,000 in compensatory damages intact where jury found intentional discrimination by defendant employer].)

By contrast with the federal ADA, California's *section 52* allows private parties to seek damages, and in fact even provides for an automatic minimum penalty--now up to $ 4,000--*when* the statute is triggered. [11]

11    To quote *subdivision (a)* of *section 52* as it reads today: "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage *but in no case less than four thousand dollars ($ 4,000)*, and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in Section 51, 51.5, or 51.6." (Italics added.) The reference to *section 51.6*, which is the Gender Tax Repeal Act of 1995, involving price discrimination because of gender, is also new since the *Harris* decision.

## II. THIS CASE

And with that, we come to the case at hand. Plaintiff David Gunther uses a wheelchair. He entered the restroom in a Jack-in-the-Box restaurant owned by

defendant John Lin at a time just before the completion of remodeling. The toilet was accessible and otherwise in compliance with the ADAAG's, but he found (a) a lack of insulation underneath the sink, and (b) a mirror that was too high. Gunther brought this action, seeking at least $ 8,000 in automatic penalties under *section 52* for the two alleged ADAAG violations.

There is also no question that defendant Lin never intended to violate the ADA. In his answer to Gunther's complaint Lin claimed that Gunther had entered the restroom "before our handyman had finished his work" of wrapping insulation around the pipe under the sink. Moreover, normally the restroom never has mirrors for anybody (because the mirror was subject to vandalism); an employee simply hung one by mistake.

Because there is no evidence that defendant Lin ever intended to violate the ADAAG's in any way, he brought a summary judgment motion based on the *Harris* decision, which, as we have seen, construed the language in *section 52* to require an intent to discriminate before its damage provisions would be triggered. Plaintiff Gunther conceded that Lin had no discriminatory intent, but argued that *Harris* had been superseded by the 1992 legislation which added what is now known as *subdivision (f) to section 51*. Relying on *Harris* and finding the decision remained good law, the trial court granted the summary judgment, resulting in a judgment of dismissal from which this appeal has been taken.

We have examined the general statutory scheme of California law governing the access of disabled persons to public accommodations, and also the legislative history of the 1992 legislation adding what is now *subdivision (f) to section 51*, and conclude:

(1) To interpret what is now *subdivision (f) of section 51* to provide for automatic penalties for even the most technical violations of the ADAAG's would contravene the rule that no statute should be interpreted so that it becomes redundant, in this case the statute made redundant being *section 54.3*. By its terms *section 54.3* provides disabled persons with an alternative means of enforcing ADA violations, and--at the time of Assembly Bill No. 1077 (1991-1992 Reg. Sess.)--had already been construed to provide for automatic minimum penalties for unintentional conduct. (*Donald v. Cafe Royale, Inc.* (1990) 218 Cal. App. 3d 168, 180 [266 Cal. Rptr. 804] ["*section 54.3* contains no intent element"].)

Since *section 54.3* by its terms forces a plaintiff to choose between it and *section 52* (see § *54.3*, *subd. (c)* ["A person may not be held liable for damages pursuant to both this section and *Section 52* for the same act or failure to act."]), the two statutory schemes, as we confront them in our decision today, perfectly dovetail with each other. A plaintiff can now go for the relatively larger recovery provided by *section 52* but will have the higher burden of establishing intentional discrimination under *section 52*, or, alternatively, may elect to proceed under *section 54.3* and have a much lower burden--simple technical violation of the ADA without any showing of intent--but can only recover a lesser amount. To interpret *section 52* to allow for automatic penalties for nonintentional conduct is to render *section 54.3* largely redundant.

(2) The legislative history surrounding the adoption of the 1992 legislation buttresses the conclusion that emerges from the general statutory scheme: The Legislature did not change the *Harris* rule requiring an intentional discrimination to trigger the automatic penalty provisions of *section 52*. Even though the general subject of remedies for discrimination against the disabled was before the Legislature within a relatively short time after the *Harris* decision, and *section 52* was in fact amended by Assembly Bill No. 1077, the language in *section 52*, *subdivision (a)* that had been construed by the *Harris* court as requiring intentional discrimination was left untouched. [12] Moreover, the construction given the language in *section 52* by *Harris* is not inconsistent with the addition of *subdivision (f) to section 51*, since there are instances where relief under *section 51* may be sought absent intentional discrimination.

12    As we note in footnote 1 above, there was a change so that instead of setting forth a list of specific categories (sex, race, etc.), the language defining the people who might litigate under the statute was simplified to say that discrimination or distinction "contrary to *Section 51*" would be covered. Since the language construed by *Harris* already included the disjunctive categories of "discrimination, distinction or restriction," we do not perceive any significance in the change to the disjunctive "discrimination or distinction" as regards the *Harris* decision.

(3) In fact, the primary purpose of the 1992 legislation adding *subdivision (f) to section 51* was not to

overturn the requirement for intentional discrimination to trigger *section 52*, but to strengthen existing California disability law by expanding the scope of that law to include mental disabilities as well as physical disabilities. Up to the 1992 legislation, California disability law did *not* cover mental disabilities; however, the recently enacted federal ADA did cover mental disabilities. By incorporating violations of the ADA into California's disability statutes, the Legislature accomplished its purpose of expanding the coverage of the state law up to the ADA level.

(4) To the degree that there is any arguable ambiguity in *section 52* (assuming arguendo that *Harris's* construction of the actual language is not itself dispositive), the canon of interpretation that courts should adopt the more reasonable construction applies. In this case the more reasonable interpretation follows the legislative scheme and the legislative history just outlined: Private enforcers of the ADA are presented with a choice between the strict liability regime of *section 54.3* or the regime requiring intentional discrimination of *section 52*. The alternative interpretation, as a number of federal courts have already indicated (e.g., *Doran v. Del Taco, Inc. (C.D.Cal. 2006) 2006 WL 2037942*), has led to unconscionable abuses.

In the present case, Gunther elected to go for the relatively higher minimum penalty provided by *section 52* rather than the lower penalty of *section 54.3*, but his election required, under state law, a showing of intentional discrimination. The trial court was accordingly correct to grant the summary judgment motion.

## III. DISCUSSION

### A. The Triggering Language of Section 52

In questions of statutory interpretation, courts must begin with the language of a given statute as the purest expression of legislative intent. (E.g., *S. B. Beach Properties v. Berti (2006) 39 Cal.4th 374, 379 [46 Cal. Rptr. 3d 380, 138 P.3d 713]* ["In construing any statute, we first look to its language."]; *DaFonte v. Up-Right, Inc. (1992) 2 Cal.4th 593, 601 [7 Cal. Rptr. 2d 238, 828 P.2d 140]* ["To determine the intent of legislation, we first consult the words themselves, giving them their usual and ordinary meaning."]; see also *White v. Ultramar, Inc. (1999) 21 Cal.4th 563, 572 [88 Cal. Rptr. 2d 19, 981 P.2d 944]* [" 'If the plain language of a statute is

unambiguous, no court need, or should, go beyond that pure expression of legislative intent.' "].)

As an intermediate appellate court, we are in the fortunate position of being spared the need to parse the ordinary, plain meaning of the triggering language of *subdivision (a) of section 52* ("denies, aids or incites a denial, or makes any discrimination or distinction") in order to determine whether that language contemplates unintentional or inadvertent conduct as distinct from intentional discrimination. The state's highest court, in *Harris*, has already held that those words do not contemplate unintentional conduct, though it should be noted that the *Harris* decision not only looked at the words, but also the contrast between the words used in the section and the words used in a federal civil rights statute. After quoting the triggering language from *section 52, subdivision (a)*, here is the relevant passage from the *Harris* decision: "Several aspects of the foregoing language point to an emphasis on intentional discrimination. The references to 'aiding' and 'inciting' denial of access to public accommodations, to making discriminations and restrictions, and to the commission of an 'offense' imply willful, affirmative misconduct on the part of those who violate the Act. Moreover, the damages provision allowing for an exemplary award of up to treble the actual damages suffered with a stated minimum amount reveals a desire to punish intentional and morally offensive conduct. In contrast, title VII of the Civil Rights Act does not allow recovery of compensatory or punitive damages, but confines the plaintiff to specified forms of equitable relief." (*Harris, supra, 52 Cal.3d at p. 1172.*)

The 1992 legislation, Assembly Bill No. 1077, made only minor changes in the triggering language (see fn. 1, above), basically dropping the enumeration of specific categories ("sex, color, race" etc. "contrary to *Section 51* ... .") in favor of a more streamlined encapsulation, i.e., simply "contrary to *Section 51* ... ." The key words, actually put into italics in the *Harris* decision itself ("denies" "aids or incites a denial" "makes any discrimination" and "offense"), were left untouched.

The question arises: Did the change that the 1992 legislation made to *section 51*, namely the addition of the language that would later be codified as *subdivision (f) of section 51*, necessarily, as a matter of text, *force* a change in the already judicially-interpreted meaning of the triggering language of *section 52*? The answer to that

precise question is no, because *subdivision (f) of section 51* has force and effect *independent* of the need for intentional discrimination as required by the language of *section 52, subdivision (a)*. Specifically, *any* "violation" of *section 51*—hence, even an unintentional violation--may be remedied by an unfair competition law action under *Business and Professions Code section 17200 et seq.*, without the need for intentional discrimination as required by *section 52*. (See *Consumers Union of United States, Inc. v. Fisher Development, Inc.* (1989) 208 Cal. App. 3d 1433 [257 Cal. Rptr. 151] [injunctive relief to stop housing development restricting residency to persons aged 45 or older predicated on Unruh Civil Rights Act]; see generally *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal. 4th 553, 562 [71 Cal. Rptr. 2d 731, 950 P.2d 1086] [" 'any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of *Business and Professions Code section 17200* and *17203*.' "].) [13] Of course, *most* of the time, violations of *section 51* implicate discriminatory conduct, including violations of the ADA, so that a *section 52* remedy (including the minimum penalty of $ 4,000) will be available.

> 13    We recognize, of course, that the issue of *standing* on the part of a nonaggrieved person, e.g., a public interest group, to enforce a nonintentional violation of *section 51*, is not before us. (Cf. *Midpeninsula Citizens for Fair Housing v. Westwood Investors* (1990) 221 Cal. App. 3d 1377 [271 Cal. Rptr. 99] [public interest group had no standing to sue apartment complex owners for occupancy limitation policy in violation of §§ *51 & 51.2* under Unruh Civil Rights Act because the public interest group's rights had not been violated].)

The 1991 case law construing the plain language *section 52* and the 1992 legislation adding a new subdivision to *section 51* can thus be harmonized. There is no textual need to retroactively override the ordinary meaning of the terms used in *section 52* as read by the *Harris* court in order to give force and effect to *subdivision (f) of section 51*.

Ordinarily, our analysis could and should stop with the language of the statute, authoritatively construed by our high court. (See *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [72 Cal. Rptr. 2d

624, 952 P.2d 641] [" 'Ordinarily, if the statutory language is clear and unambiguous, there is no need for judicial construction.' "].) Which is what the trial court here did. It stopped with the language as construed by *Harris*.

However, Gunther essentially asserts that despite the actual language in *section 52*, the 1992 legislation was intended by the Legislature to extend the reach of *section 52* even to *unintentional* violations of the ADA, specifically unintentional noncompliance with the various and often technical architectural guidelines, a position which one federal court decision has taken, and language in another federal court decision might be construed to support. Gunther directs us to an uncodified expression of legislative intent to the effect that the 1992 legislation--which, as we shall see, included much more than merely adding the language now including *subdivision (f) to section 51*--was to "strengthen California law in areas where it is weaker than the Americans with Disabilities Act of 1990 (Public Law 101-336) and to retain California law when it provides more protection for individuals with disabilities than the Americans with Disabilities Act of 1990." (Stats. 1992, ch. 913, § 1, p. 4282.)

Essentially, Gunther asserts that this uncodified expression means that the Legislature intended to subject businesses (and, as shown by the case law, usually small businesses like restaurants) to the worst of all possible worlds: (1) the strict liability of the ADA architectural guidelines but *without the counterbalancing* limitations in the ADA disallowing private enforcement combined with (2) the minimum $ 4,000 penalty of California's *section 52* but *without the counterbalancing* protection established by *Harris* (and, for that matter, the plain meaning of the language of *section 52* itself) requiring intentional conduct for the minimum penalty under *section 52* to be triggered.

Did the 1992 Legislature really mean to do *that*? To answer the question fully, we may proceed to various canons of legislative interpretation as well as to legislative history. (See, e.g., *Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal. Rptr. 3d 390, 74 P.3d 166] ["When the plain meaning of the statutory text is insufficient to resolve the question of its interpretation, the courts may turn to rules or maxims of construction ... ."]; see also *Big Creek Lumber Co. v. County of Santa Cruz* (2006) 38 Cal.4th 1139, 1153 [45 Cal. Rptr. 3d 21,

*136 P.3d 821]* ["When as here a statute is susceptible to more than one reasonable interpretation, 'we look to "extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' "]; cf. also *S. B. Beach Properties v. Berti, supra,* 39 Cal.4th 374, 379 [" 'If the language permits more than one reasonable interpretation, however, the court looks "to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part." ' "]; *Microsoft Corp. v. Franchise Tax Bd.* (2006) 39 Cal.4th 750, 758 [47 Cal. Rptr. 3d 216, 139 P.3d 1169] ["As with any issue of statutory interpretation, we begin with the text of the relevant provisions. If the text is unambiguous and provides a clear answer, we need go no further. [Citation.] If the language supports multiple readings, we may consult extrinsic sources, including but not limited to the legislative history and administrative interpretations of the language."].)

B. The 1992 Legislative Acquiescence to the 1991 Judicial Construction

    Since the 1992 legislation followed so closely on the heels of the 1991 *Harris* decision construing *section 52,* and since the 1992 legislation did, indeed, modify *section 52,* just not the triggering language construed by *Harris,* it is perhaps most logical to begin our examination with the doctrine of legislative acquiescence.

    The doctrine of legislative acquiescence is a canon of statutory interpretation based on the idea that, in a nutshell, a legislative body is presumed to be aware of prior judicial construction of statutory language, particularly when it undertakes to amend the area of the law judicially construed: If it doesn't change the language judicially construed, there is at least an inference that the Legislature agreed with the prior judicial construction. (E.g., *People v. Garcia* (2006) 39 Cal.4th 1070, 1088 [48 Cal. Rptr. 3d 75, 141 P.3d 197] ["Because the Legislature amended the welfare fraud statutes after this court's decision in *Sims* became final, we assume that the Legislature was aware of this court's construction of the welfare fraud statutes in that case. Had the Legislature wanted to invalidate *Sims,* it could have provided that no administrative decision would prevent a prosecution for

welfare fraud."]; *White v. Ultramar, Inc., supra,* 21 Cal.4th at p. 572 ["when the Legislature amends a statute, we presume it was fully aware of the prior judicial construction"].)

    A textbook example of the doctrine of legislative acquiescence may be found in *People v. Leahy* (1994) 8 Cal.4th 587 [34 Cal. Rptr. 2d 663, 882 P.2d 321]. There, our high court noted that the Legislature had "ample opportunity to amend" various evidentiary statutes to "abrogate or modify" a certain standard involving expert testimony that a prior Supreme Court case, specifically, *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal. Rptr. 144, 549 P.2d 1240], had "found implicit" within those statutes. (*Leahy, supra,* 8 Cal.4th at p. 604.) The *Leahy* court noted that the Legislature had "made frequent amendments" to other parts of the evidence laws involving expert testimony, but did not amend the particular sections (*Evid. Code, §§ 720 & 801*) construed in the prior court case. In that light the *Leahy* court declared this principle: "Legislative failure to amend *sections 720* or *801,* although not conclusive, may be presumed to signify legislative acquiescence in our *Kelly* decision." (*Leahy, supra,* 8 Cal.4th at p. 604.)

    We are also mindful, however, that the doctrine of legislative acquiescence has limitations, which, ironically, the *Harris* case itself recognized. For example, legislative inaction after a given statute has been judicially construed provides only a weak inference of acquiescence. (See *Harris, supra,* 52 Cal.3d at p. 1156 ["The presumption of legislative acquiescence in prior judicial decisions is not conclusive in determining legislative intent. As we have also stated: ' "Legislative silence after a court has construed a statute gives rise at most to an arguable inference of acquiescence or passive approval ... . But something more than mere silence is required before that acquiescence is elevated into a species of implied legislation ... ." ' "].)

    Very recently our Supreme Court issued *Big Creek Lumber Co. v. County of Santa Cruz, supra,* 38 Cal.4th 1139 (hereinafter, *Big Creek II*), which, when we compare the majority and dissenting opinions, teaches a number of lessons with which the entire high court would appear to agree. In *Big Creek II,* legislative acquiescence to a lower appellate court decision (*Big Creek I* [14]) counted as one factor among several to support a conclusion about how a particular state timber preemption statute should be construed. The dissenters,

however, thought that legislative acquiescence to the prior lower decision was not persuasive, partly because they thought the lower court decision had itself misconstrued the plain language of the statute, and partly because the "general subject" of that decision had not come before the Legislature in "connection with a subsequent amendment." (*Big Creek II, supra*, 38 Cal.4th at pp. 1174-1175 (dis. opn. of Moreno, J.).)

      14       Specifically, *Big Creek Lumber Co. v. County of San Mateo* (1995) 31 Cal.App.4th 418 *[37 Cal. Rptr. 2d 159]*.

As applied to the case at hand, it would be safe to say that much *more* force should be accorded to the fact that the triggering language of *section 52* as construed by *Harris* was not touched by the Legislature in the 1992 legislation than was accorded to the fact that the Legislature had not changed the particular timber statute in *Big Creek II*.

First, unlike *Big Creek II*, the case before us now involves a prior *Supreme Court* decision that *authoritatively* construed the statutory language. Unlike what happened in *Big Creek II*, there could not be the debate over whether the first lower court decision to have construed the statutory language got it right.

Second, not only was the *Harris* decision from a higher court, but its construction of the statutory text rested on firmer ground than the appellate court's prior construction in *Big Creek I*. There was a debate in *Big Creek II* over whether the statutory language was ambiguous, and thus *permitted* the prior judicial interpretation (the majority position), or whether it was unambiguous in the *opposite* direction of the prior judicial interpretation (the dissenting position). In *Harris*, by contrast, while there were two dissenters, neither one of them took issue with what the majority had to say about the triggering language of *section 52* requiring intentional discrimination. (See *Harris, supra*, 52 Cal.3d at p. 1176 (dis. opn. of Mosk, J.); *id*. at pp. 1176-1183 (dis. opn. of Broussard, J.).) Their concern was the first holding of the case, which was that the Unruh Civil Rights Act did not reach arbitrary *economic* discrimination. (*Harris* arose out of a case against landlords who had an assertedly arbitrary requirement that renters have an income at equal to or higher than three times the rent.) In contrast to the facts in *Big Creek II*, the language in *section 52* is plainer in the direction that *supports* the inference provided by the doctrine of legislative acquiescence.

Finally, there appears to have been a more intense subsequent legislative focus on the "general subject" of the previously construed statute than in *Big Creek II*. If there was "ample opportunity" to amend in *Big Creek II* (see *Big Creek II, supra*, 38 Cal.4th at p. 1156), there was much more ample opportunity here.

In the case before us, the very statute that had been construed in *Harris* less than two years before--*section 52*--was before the Legislature and was indeed being amended. But, as we shall see, the amendments were directed at expanding the *class* of persons who could seek damages under *section 52*, but they had no affect on the triggering language in *subdivision (a)* construed by *Harris*.

The doctrine of legislative acquiescence should thus apply "in full measure" to the case before us.

**C. The Statutory Scheme of Which the Statute is a Part; and the Rule of Construction Against Statutory Redundancy or Nullification**

As we have seen, in cases of statutory ambiguity, an analysis of how a statute fits within a general statutory scheme may allow a court to divine its correct meaning. In the present case, interestingly enough, when we examine California statutes regarding private remedies for even unintentional ADA violations, we discover that the alternative would strip another statute also governing the rights and remedies of disabled persons, *section 54.3*, of force and meaning. (See *Big Creek II, supra*, 38 Cal.4th at p. 1155 ["Plaintiffs' reading of *section 4516.5(d)* also would violate the fundamental rule that '[c]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage' "]; *Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th at p. 775 [" ' "In analyzing statutory language, we seek to give meaning to every word and phrase in the statute to accomplish a result consistent with the legislative purpose ... ." ' "].)

Under California law, there is an alternative set of statutory remedies available to disabled persons who encounter a violation of the ADA--*section 54.3*, which is part of what is commonly referred to as the Disabled Persons Act. (The title often shows up in federal court decisions, e.g., *Wilson v. Costco Wholesale Corporation* (S.D.Cal. 2006) 426 F. Supp. 2d 1115, 1123 [noting

federal plaintiff had filed ancillary jurisdiction claims under both "Unruh Civil Rights Act" and "Disabled Persons Act"]). The Disabled Persons Act is found in *sections 54 through 55.2* of our Civil Code, and has been around in some form on the statute books since the late 1960's--more than 20 years before the federal ADA. (See Stats. 1968, ch. 461, § 1, p. 1092.)

The Disabled Persons Act begins with the statement in *subdivision (a) of section 54* that, "Individuals with disabilities or medical conditions have the same right as the general public to the full and free use of ... public facilities, and other public places."

*Section 54* is immediately followed by *section 54.1, subdivision (a)(3)* of which--in contrast to the more spartan reference to the ADA in *section 51*--specifically incorporates ADA *regulations* (at least insofar as transportation is concerned). [15] The enforcement of *section 54* is to be found in *section 54.3*. [16] However, *subdivision (c) of section 54.3* makes it clear that a plaintiff must *elect* between proceeding under *section 54.3* and *section 52*. Subdivision (c) of section 54.3 provides: "A person may not be held liable for damages pursuant to both this section and *Section 52* for the same act or failure to act."

[15] *Subdivision (a)(3) of section 54.1* provides: " 'Full and equal access,' for purposes of this section in its application to transportation, means access that meets the standards of Titles II and III of the Americans with Disabilities Act of 1990 (Public Law 101-336) and federal regulations adopted pursuant thereto, except that, if the laws of this state prescribe higher standards, it shall mean access that meets those higher standards."

[16] *Subdivision (a) of section 54.3* provides in its entirety: "Any person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities as specified in *Sections 54* and *54.1* or otherwise interferes with the rights of an individual with a disability under *Section 54, 54.1*, and *54.2* is liable for each offense for the actual damages and any amount as may be determined by a jury, or the court sitting without a jury, up to a maximum of three times the amount of actual damages but in no case less than one thousand dollars ($ 1,000), and attorney's fees as may be determined by the court in addition thereto, suffered by any

person denied any of the rights provided in *Sections 54, 54.1*, and *54.2.* 'Interfere,' for purposes of this section, includes, but is not limited to, preventing or causing the prevention of a guide dog, signal dog, or service dog from carrying out its functions in assisting a disabled person."

Now, it is important to realize--to allude to our previous discussion of the doctrine of legislative acquiescence--that *section 54.3* was construed in the 1990 *Cafe Royale* decision as providing for strict liability?that is, liability without any need for intentional conduct--prior to the 1992 legislation which added both *subdivision (f) to section 51* and *subdivision (c) of section 54* (back then in the context of the minimum penalty under *section 54.3* which was $ 250; now it is $ 1,000).

*Cafe Royale* was a case decided prior to the enactment of the ADA, and contains not a word about federal law. It was also decided exclusively under *Civil Code section 54 et seq.*, and contains not one word on the Unruh Civil Rights Act.

In *Cafe Royale*, a wheelchair user (a former deputy Attorney General and member of the Attorney General's task force on disability) discovered that he could not reach the main dining area of a tiered restaurant on his own, though the restaurant offered to lift him up the stairs. He declined an offer of help because it would attract attention and because he might be dropped in the process of being bodily picked up and moved. He sued the restaurant under *section 54.3* because of the absence of ramps or elevators to the second-tiered area. The restaurant thought that it had complied with the law because its architect thought, based on an informal conversation with an employee of the San Francisco building department, that a certain number of handicapped seating places was "all that was needed for compliance." (See *Donald v. Cafe Royale, supra, 218 Cal.App.3d at p. 174*.)

The building department employee, however, gave the restaurant architect erroneous advice. In fact, the State Building Standards Code (required by *Gov. Code, § 4450 et seq.*) provided that all floors of a restaurant be on a common level or else accessible by either ramps or elevators. While a hardship exemption might be obtained, 75 percent of the main dinning area would still need to be handicap accessible, and the Cafe Royale's option of seating wheelchair patrons in the bar or having them

carried to the common area was a violation.

On appeal, the fact of the violation was understood by all parties: "All parties agreed that Cafe Royale's seating capacity was in violation of the handicap access requirements." (*Donald v. Cafe Royale, supra, 218 Cal. App. 3d at p. 174.*) Hence issue was joined as to whether the restaurant's ?good faith" belief that it was "in compliance" (*ibid.*) was sufficient to deny the patron recovery under *section 54.3*. The trial court thought so, but the appellate court disagreed. The appellate court reasoned thusly: The fact that *section 54.3* said a person who " 'denies or interferes with admittance to or enjoyment of the public facilities as specified in *Sections 54* and *54.1* ... is liable for each such offense ... but in no case less than two hundred fifty dollars ($ 250) ...' " (*218 Cal.App.3d at p. 176*). The court said: "The plain meaning of this language is that ordinarily minimum statutory damages in the amount of $ 250 must be awarded for a denial of equal access in violation of *Section 54 et seq., notwithstanding the defendant's intent.*" (*218 Cal.App.3d at p. 177*, italics added.) The *Cafe Royale* court reasoned that an interpretation of *section 54.3* that included an element of intentional violation would, "because the level of compliance would diminish," yield "a result that is clearly repugnant to the statutory purpose." (*218 Cal.App.3d at pp. 179-180.*) So the trial court reversed the trial court judgment awarding the plaintiff nothing, and concluded that he was entitled to the $ 250 statutory minimum. (See *id. at pp. 180-181.*)

Apropos our discussion of the doctrine of legislative acquiescence above, there is at least some presumption that the 1992 Legislature knew about the 1989 *Cafe Royale* decision and crafted the 1992 legislation in recognition of it.

An interpretation of *section 52* which, contrary to *Harris*, allows for automatic penalty without intentional discrimination renders *section 54.3*, as construed by *Cafe Royale*, redundant. Under such an interpretation, the two statutes simply become coterminous schemes as regards unintentional violations of the ADAAG's.

By contrast, an interpretation of *section 52* which respects the meaning of the triggering language requiring intentional discrimination make the two statutes dovetail nicely. Where there is intentional discrimination, there is a four times larger minimum penalty; if there isn't, plaintiff still recovers, but less.

In that regard, we note that *section 52* expressly contemplates the possibility of punitive damages (*§ 52, subd. (b)(1)* [17] while there is no such provision in *section 54.3*. So again, the statutes dovetail. The legislative policy that the greater evil of *intentional* discrimination is vindicated by assuring a higher potential exposure to damages on the part of a *section 52* defendant. The difference in the two statutes also helps assure that punitive damages not be incorrectly assessed against a defendant for only unintentional conduct. (See *Taylor v. Superior Court (1979) 24 Cal.3d 890, 894-895 [157 Cal. Rptr. 693, 598 P.2d 854]* [quoting Prosser that "Something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage ... *or such a conscious and deliberate disregard of the interests of others that his conduct may be called wilful or wanton.*" (*Taylor* court's italics)].)

    17    Which provides: "An amount to be determined by a jury, or a court sitting without a jury, for exemplary damages." (*§ 52, subd. (b)(1)*.)

To the degree that *section 52* and *section 54.3 may* differ on exposure to attorney fees, with no exposure to a losing plaintiff if he or she proceeds under *section 52* but with exposure to the plaintiff if he or she proceeds under *section 54.3*--and there is authority for such a reading--our analysis is further *confirmed*, though the definitive statement on that point can await another case. 18 It makes sense that the Legislature would insulate plaintiffs from the risk of exposure to paying defense fees if they lose where the showing required of the plaintiff--intentional discrimination--is higher. This incentive furthers the legislative policy of attacking the greater evil of intentional discrimination by removing a potential impediment to private enforcement. Where the burden is as easy as it is under *section 54.3*, allowing exposure to fees if the plaintiff loses would be a logical deterrent against genuinely frivolous lawsuits.

    18    The issue centers on *section 55. Section 55* provides in its entirety: "Any person who is aggrieved or potentially aggrieved by a violation of Section 54 or 54.1 of this code, Chapter 7 (commencing with Section 4450) of Division 5 of Title 1 of the Government Code, or Part 5.5 (commencing with Section 19955) of Division 13 of the Health and Safety Code may bring an

action to enjoin the violation. The *prevailing party* in the action shall be entitled to recover reasonable attorney's fees." (Italics added.) Because of the "prevailing party" clause, the trial court in *Cafe Royale* had awarded $ 12,000 in attorney fees against the disabled ex deputy Attorney General. Contrast that result as regards *section 54.3* with dicta in *Stirling v. Agricultural Labor Relations Board (1987) 189 Cal. App. 3d 1305, 1311 [235 Cal. Rptr. 56]*, to the effect that attorney fees under the Unruh Civil Rights Act are unilateral--the plaintiff need not fear about losing: "When the Legislature intends that the successful side shall recover its attorney's fees no matter who brought the legal proceeding, it typically uses the term 'prevailing party.' [Citations.] On the other hand, when the Legislature desires to authorize the award of fees only to one side or the other, it signals that intent by using such terms as 'plaintiff' (see, e.g., ... Civ. Code, [§] 52 ... ) or 'defendant' [citations]." In any event a *frivolous lawsuit* under the Unruh Civil Rights Act could be presumably redressed by such means as sanctions under *section 128.7 of the Code of Civil Procedure*.

However, we do not go so far as to conclude, in this opinion, that the contrast between *section 55* which awards attorney fees to the prevailing party and *section 52*, which only speaks of plaintiff's recovery, compels a conclusion that the *section 54.3* plaintiff is vulnerable to attorney fees if he or she loses. *Subdivisions (a) of both section 54.3* and *section 52* are structured to provide for liability for attorney fees if the statute is triggered without reference to prevailing party. We leave for another day the issue of how *section 55* interacts with *section 54.3* and specifically whether a *section 54.3* plaintiff is vulnerable as the nonprevailing party under *section 55*.

D. The Legislative History of Assembly Bill No. 1077

What we have said so far is, in theory, dispositive, but we also recognize that legislative *history* can also be *a* factor in the exploration of legislative *intent*. For example, if the legislative history, otherwise independent of the language and surrounding statutory scheme, showed *clearly* that the Legislature really did intend to reverse the *Harris* decision upon the construction of *subdivision (a)* of section 52, we should at least be given

pause to ponder whether the conclusion otherwise required by the language and canons of statutory construction was correct. (Cf. *J.A. Jones Construction Co. v. Superior Court (1994) 27 Cal.App.4th 1568, 1579 [33 Cal. Rptr. 2d 206]* [noting importance of "*clear statement* of intent in the legislative history"].)

On the other hand, as we learn from the recent decision in *Bernard v. Foley (2006) 39 Cal. 4th 794 [47 Cal. Rptr. 3d 248, 139 P.3d 1196]*, legislative history can be a factor to be weighed along with language and structure of a statute, and will often (as is logical) *support* the conclusion to be drawn from the bare language of a statute and its surrounding statutory structure. (*Id. at p. 809* ["In sum, we conclude that nothing in the statute's structure, terms or language authorizes us to impose a professional or occupational limitation on the definition of 'care custodian' ... . This conclusion is buttressed by the legislative history of the statute, to which we now turn."].) Also, our Supreme Court will sometimes *test* a conclusion regarding statutory construction by examining contemporaneous legislative history. (E.g., *Wells v. One2One Learning Foundation (2006) 39 Cal.4th 1164, 1208, fn. 31 [48 Cal. Rptr. 3d 108, 141 P.3d 225]*.)

As alluded to above, the genesis of the addition of *subdivision (f) to section 51* was Assembly Bill No. 1077 (Stats. 1992, ch. 913, § 3, p. 4283) authored by Assembly Member Bruce Bronzan, and initiated by a private organization, Protection & Advocacy Incorporated (often called PAI in the historical materials). (See Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1077 (1991-1992 Reg. Sess.) Jan. 22, 1992, p. 4 ["Protection & Advocacy Incorporated (PAI) is the sponsor of this bill."].) PAI's own letterhead designated itself as an organization advocacy group "Mandated to protect and advocate for the rights of Californians with developmental disabilities or identified as mentally ill." [19]

[19]    There is a body of case law involving what is, and what is not, appropriate for examination as legislative history, assuming, for sake of argument, that reference to legislative history is appropriate in the first place. A court is always on firm ground to "consider legislative committee reports and analyses, including statements pertaining to the bill's purpose." (See *Sully-Miller Contracting Co. v. California Occupational Safety & Health Appeals Bd. (2006) 138 Cal.App.4th 684, 698, fn. 6 [41 Cal. Rptr. 3d 742]*

; see also *Hutnick v. United States Fidelity & Guaranty Co. (1988) 47 Cal.3d 456, 465, fn. 7 [253 Cal. Rptr. 236, 763 P.2d 1326].*) There is also authority that mere summaries by proponents of bills are *not* appropriate legislative history (see *Williams v. Superior Court (2001) 92 Cal.App.4th 612, 621, fn. 6 [111 Cal. Rptr. 2d 918]*), and in that vein there is the well established "judicial reticence to rely on statements made by individual members of the Legislature as an expression of the intent of the entire body." (*Friends of Mammoth v. Board of Supervisors (1972) 8 Cal.3d 247, 258 [104 Cal. Rptr. 761, 502 P.2d 1049].*) We may therefore arguably be incorrect in even looking at the miscellanous materials from the Senate Judiciary Committee's bill file to test what is otherwise a clear conclusion dictated by the language of the statute and canons of statutory construction. Perhaps we should confine our discussion to the legislative committee reports and analyses--at the very least this opinion would be shorter. In any event, this opinion should *not* be read as authority for the idea that miscellanous materials in committee files are good legislative history. However, by consulting these materials as well as looking at the committee reports and analyses we are able to say with confidence that *nothing* in the legislative history shows an intent to change what *Harris* said about *section 52.* (The issue is, as it turns out, ultimately academic. Only if it turned out that the miscellanous materials from the committee bill file *clearly* showed an intent to reverse *Harris* (which they don't) would we be forced to confront their independent value--probably little or none--as legislative history.)

In the wake of the passage of the federal ADA in 1990, scheduled to take effect in 1992, there was a perceived need to bring California law into conformity with the provisions of the ADA, particularly because the ADA covered mental disabilities while state law did not, particularly in the area of employment. (See Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading, analysis of Assem. Bill No. 1077 (1991-1992 Reg. Sess.) Jan. 30, 1992, p. 1 ["The ADA will go into effect in July of this year ... . California law and regulations currently provide protection to disabled persons in many of the areas covered by the ADA. In some areas, state law and regulations may provide more protection than the ADA.

In other areas, *such as employment discrimination against individuals with mental disabilities,* California law provides less protection." (Italics added.)]; Assem. Com. on Judiciary, Rep. on Assem. Bill No. 1077 (1991-1991 Reg. Sess.) Jan. 6, 1992, p. 1 ["California law and regulations currently provide protection to disabled persons in many of the areas covered by the ADA. In some areas, state law and regulations may provide more protection than the ADA. In other areas, such as employment discrimination against individuals with mental disabilities, California law provides less protection."]; see also Legal Services Section of the State Bar of Cal., analysis of Assem. Bill No. 1077 (1991-1992 Reg. Sess.) June 13, 1991, p. 1 ["Existing state law is a confusing hodge-podge of terminology and rights regarding disabled individuals. The purpose of AB 1077 is to conform state law to the Americans With Disabilities Act of 1990 (ADA)."].)

Indeed, if there is one dominant theme in the legislative history of Assembly Bill No. 1077, it was the broadening of state law to include mental disabilities along with physical ones to bring it in line with the ADA. This effect was recognized in the reports of the various committees, including the Senate Rules Committee, [20] the Assembly Judiciary Committee [21] and the Senate Judiciary Committee. [22]

> 20    The following language comes from pages 4 through 5 of the Senate Rules Committee Report on Assembly Bill No. 1077, dated August 29, 1992:
>
> --"Existing law prohibits discrimination on the basis of physical or mental disability in the receipt of benefits under any program funded directly or financially assisted by the state. [¶] This bill would make that prohibition applicable to any disability as defined, rather than mental or physical disability, and would require these programs to meet or exceed specified protections and prohibitions in the Americans with Disabilities Act of 1990."
>
> --"The bill would require employers and certain other entities to make specified reasonable accommodations for employees with physical or mental disabilities and would require an employee making certain preemployment inquires concerning a prospective employee's fitness, or refusing to hire or discharging a disabled

employee, to comply with the Americans with Disabilities Act of 1990."

--"The bill would specify that the definitions of 'physical disability' and 'mental disability' in the California Fair Employment and Housing Act are superseded by the definition of 'disability' in the federal Americans with Disabilities Act of 1990 if broader civil rights protections would thereby be produced for persons with mental or physical disabilities or a medical condition."

21    From the Report of the Assembly Judiciary Committee on Assembly Bill No. 1077 dated January 22, 1992, at page 2: "Modify the language contained in state anti-discrimination laws to ensure that protections are given to individuals with physical or mental disabilities. (Conforms to the ADA.)"

22    See Senate Committee on the Judiciary, Report on Assembly Bill No. 1077 dated June 9, 1992, at page 10: "This bill complies with ADA requirements that protect of [sic] individuals with either physical or mental disabilities."

What one does *not* find in the legislative history of Assembly Bill No. 1077 is any mention of the *Harris* intentional discrimination issue as it interacted with the provision of in the bill (which later became *subdivision (f) of section 51*) making violations of the ADA a "violation" of *section 51*. There was a *related* bill, Assembly Bill No. 3825 (1991-1992 Reg. Sess.) which, at the time (the spring of 1992), *did* target the *Harris* decision's conclusion that "arbitrary economic discrimination" was not within the purview of the Unruh Civil Rights Act.[23] But that bill never became law.[24]

23    See California Consumer Services Agency, bill summary, Assem. Bill No. 3825 (1991-1992 Reg. Sess.) March 16, 1992, page 1. Assembly Bill No. 3825 "includes the following major provisions which are of direct interest to the Fair Employment and Housing Commission (Commission): [¶] 2) Amending the Unruh Civil Rights Act to prohibit arbitrary economic discrimination, reaffirming In re Cox and overturning Harris v. Capitol Growth Investors and Gay v. Polk Gulch, Inc. (modified from SB 1257) ... ."

24    In fact, it had already been vetoed by the time the Legislative Counsel's office sent

Governor Pete Wilson a report on the enrolled bill concerning Assembly Bill No. 1077. (See Cal. Legis. Counsel Enrolled Bill Rep. on Assem. Bill No. 1077 (1991-1992 Reg. Sess.) prepared for Governor Pete Wilson (Oct. 1, 1992) p. 1, fn. 1.)

The best case one can make from the legislative history is the *general* statement of legislative intent (also quoted from Stats. 1992, ch. 913, § 1, p. 4282) behind the passage of Assembly Bill No. 1077 was to "strengthen California law in areas where it is weaker than the Americans with Disabilities Act of 1990 (Public Law 101-336) and to retain California law when it provides more protection for individuals with disabilities than the Americans with Disabilities Act of 1990." (Stats. 1992, ch. 913, § 1, p. 4282.)

It does not follow from this statement, however, that the Legislature implicitly amended *section 52* to allow for minimum penalties for even unintentional conduct. Several reasons support this conclusion.

First, the Legislature accomplished its intent by indeed "strengthening" California law where it provided less protection--most specifically by broadening coverage to those with mental disabilities,[25] but also by ensuring that the architectural *standards themselves* would be at least the level set by federal law.[26]

25    Other areas made stronger were to limit an existing exemption for practitioners of the healing arts to refuse treatment to disabled persons and access to public accommodations by persons using guide or signal dogs. (See Sen. Rules Com., Rep. on Assem. Bill No. 1077 (1991-1992 Reg. Sess.) Aug. 29, 1992, p. 2.)

26    See Senate Rules Committee, Report on Assembly Bill No. 1077 (1991-1992 Reg. Sess.) page 6 ("Existing law requires specified places of public amusement and resort to be equipped with wheelchair spaces and other seating and accommodations for persons with physical disabilities. [¶] This bill would make compliance with these provisions subject to no lesser standards than prescribed in federal regulations.") and Assembly Committee on the Judiciary, Report on Assembly Bill No. 1077 (1991-1992 Reg. Sess.) page 3 ("Generally, provide that state law or regulation guaranteeing full and equal access for disabled individuals meet or exceed the standards under the ADA. Also, require that

regulations developed by the State Architect meet or exceed the architectural access standards in the ADA.").

The question of whether original California standards provide more or less protection is not always an easy one, however. For example, one commentator has noted that it is unclear what offers more protection--original California standards that require that curb ramps have a one-half inch lip at the bottom or federal standards that require a flush transition? (See Becker, *Private Enforcement of the Americans With Disabilities Act Via Serial Litigation: Abusive or Commendable* (2006) *17 Hastings Women's L.J. 83, 96.*) Under the facts in this case we need not deal with the issue, though it does illustrate why unintentional violations of the ADAAG's might not be subject to the higher automatic minimum penalties of *section 52.*

And at the same time, California law was *retained* in areas where it was indeed "stronger" than the ADA. *Section 54.3,* with its minimum penalties based on strict liability for architectural noncompliance, as shown in *Cafe Royale,* was unaffected. There is nothing necessarily inconsistent with the Legislature strengthening "protection" for the disabled and *retaining* an intentional discrimination requirement for the higher minimum penalty provided under *section 52.* In that regard, the focus of the Senate Rules Committee's Report on the addition of *subdivision (f) to section 51* addressed only the context of broadening coverage. [27]

> 27    Senate Rules Committee, Report on Assembly Bill No. 1077 (1991-1992 Reg. Sess.) August 29, 1992, page 2: "Existing provisions of the Unruh Civil Rights Act and related provisions, with certain exceptions, prohibit various types of discrimination by business establishments and franchisors, and in written instruments relating to real property, including discrimination on the basis of blindness or other physical disability. [¶] This bill would make a violation of the Americans with Disabilities Act of 1990 also a violation of the Unruh Civil Rights Act, and would expand the express coverage of that act and related provisions to include discrimination on account of *any* disability." (Italics added.)

Second, the force of *section 51, subdivision (f)'s*

application of ADA law to the Unruh Civil Rights Act itself, *consistent with the Harris reading of section 52,* should not be underestimated. After Assembly Bill No. 1077, intentional violations of the ADA, even architectural or structural ones, [28] would be redressed with the potential for punitive damages under the Unruh Civil Rights Act, and unintentional violations could be made the subject of injunctive relief. And *unintentional* violations would result in the minimum penalty provided by *section 54.3.*

> 28    Senate Rules Committee, Report on Assembly Bill No. 1077 (1991-1992 Reg. Sess.) August 29, 1992, page 2: "Existing provisions of the Unruh Civil Rights Act and related provisions specify that persons providing property for compensation are not required to modify their property or provide a higher degree of care for physically disabled persons than for persons who are not physically disabled. [¶] This bill would delete those provisions."

Third, if the Legislature really had wanted to impose the higher minimum penalties contemplated by *section 52* for *unintentional section 51* violations, one might think that it would have been noticed by those opposing the bill, if not also by impartial analysts who would spot the redundancy such a measure would create for *section 54.3.* [29] But no. The issue is not mentioned in the various references to the arguments of those opposing Assembly Bill No. 1077, which tended to focus on the extension of coverage to employers of five or more people, [30] something which supporters themselves recognized as the main reason for opposition to the bill. [31] The *closest* any opponent of the bill came to objecting to any effect which the addition of the language that would become *subdivision (f)* would have on *section 51* was a letter from a labor law advisor for the California Chamber of Commerce, which asserted (a) that the bill would allow for punitive damages which "are not allowed under the similar ADA provisions," and (b) that the bill had within it the potential exposure of operators of places of public accommodations "to greater liability [than the ADA], even for unintentional violations of the new federal standard." [32] Even that lone warning, however, we must now note, is consistent with a reading of *section 52* requiring intentional discrimination. *Section 52, subdivision (b)(1)* does indeed (a) allow for punitive damages, which, post Assembly Bill No. 1077, could include damages for the intentional violation of the ADA

[33] while *section 54.3* does indeed (b) allow for greater liability for unintentional violation of the ADA than the ADA itself allows. (For unintentional violations the ADA offers no minimum penalties.)

29    At this point we will have to make reference to materials from the Senate Judiciary Committee's bill file that do not appear to be, strictly speaking, good evidence of legislative history. (See fn. 20 above.) We do so only to prove a negative, i.e., to show that there really is nothing in the legislative history or "legislative nonhistory" that shows an intent by the Legislature to undo the *Harris* decision.

30    See Shirley Knight, Assistant State Director NFIB, memorandum Members, Assembly Committee on the Judiciary, January 21, 1992, page 1 ("While the Americans Disabilities Act of 1990 applies only to employers of 15 or more employees, AB 1077 would include employers of five to 14 employees."); letter from Willie Washington, Director, Human Resources California Manufacturers Association, to Honorable Bill Lockyer, Chair, Senate Judiciary Committee, dated June 2, 1992 ("ADA applies only to employers of 15 or more employees, and this bill would further expand its application to employers of 5 to 14 employees.").

31    The legislative history materials supplied by the Legislative Intent Service contain from the legislative bill file of the Senate Judiciary Committee two documents, one a set of questions and answers, and the other a "fact sheet," each with identical language about the opposition, that appear to have been prepared by PAI, or in any event supporters of the bill (since the questions and answers otherwise urge readers to contact Senate Judiciary Committee members to support the bill). Here is that language as it characterizes the opposition to Assembly Bill No. 1077: "Who opposes AB 1077? [¶] The Chamber of Commerce and others in the business community. [¶] Why Do They Oppose AB 1077? [¶] The ADA specifies that persons with mental and developmental disabilities must be protected if they work for an employer who employs 15 or more persons. [¶] Existing California law does not cover persons with mental or developmental disabilities. However, it specifies that businesses which employ five or more employees are

covered by discrimination laws."

32    See letter from Melanie Wiegner, Labor Law Advisor, California Chamber of Commerce, to Honorable Bruce Bronzan, dated June 1, 1992, at page 2 (part of Senate Judiciary Committee miscellaneous material bill file).

33    Which was also a concern expressed by a letter from the Building Owners and Managers Association of California (BOMA), which objected to the possibility of punitive damages for ADA violations. ("BOMA's concerns with AB 1077 lay strictly with the fact that the measure would place the protection for disabled rights in the state's Unruh Civil Rights Act, including the requirement that all public accommodations meet the ADA accessibility standards. The problem with placing the requirements for accessibility under the Unruh Civil Rights Act is that persons found to be in violation of the Act's provisions can be subject to punitive damages.").

There is a distinction, however, between the possibility of punitive damages for intentional conduct (the *Harris* reading of *section 52*) and the inevitability of minimum damages for unintentional conduct (the reading that Gunther now wants us to adopt). No one opposing the bill made the point that the bill was obliterating that distinction--the most likely reason being that there was nothing in the language of the bill or the discussions of what it was supposed to do that alerted them to the possibility. Added support for that conclusion is found in the letter from the bill's author, Bruce Bronzan, to Governor Wilson urging him to sign the bill: Bronzan confidently pointed out that "AB 1077 has *little opposition* as a result of meetings with business groups and various administrative departments" (italics added), a statement hardly suggestive of the kind of abuses against small businesses which the Gunther interpretation (see below) would later entail.

And of course, post Assembly Bill No. 1077, *section 54.3* does indeed allow for greater liability than the ADA for unintentional violations of the ADA, albeit not quite as great a liability as plaintiff Gunther here wants.

In sum, the legislative history of Assembly Bill No. 1077 does not support an intention--not a clear intention, not even a fuzzy intention--by the Legislature to change the meaning of the triggering language in *section 52*. The intention of strengthening state law where it was weaker

than federal law and retaining state law where it was stronger than federal law was perfectly compatible with not altering the established interpretation of *section 52* at the time.

E. The Rule of Reasonable Construction

We now come to the canon of statutory construction which says that when courts are faced between two interpretations of the same statute, courts should consider the consequences that flow from a particular interpretation. (See *Copley Press, Inc. v. Superior Court* (2006) 39 Cal.4th 1272, 1291 [48 Cal. Rptr. 3d 183, 141 P.3d 288]* ["To the extent this examination of the statutory language leaves uncertainty, it is appropriate to consider 'the consequences that will flow from a particular interpretation.' "].) The idea is that, as between two interpretations, and all else being equal, courts should prefer the more reasonable one (see *ibid.* ["Where more than one statutory construction is arguably possible, our 'policy has long been to favor the construction that leads to the more reasonable result.' "].) It is a policy that "derives largely from the presumption that the Legislature intends reasonable results consistent with its apparent purpose." (*Ibid.*) And, of course, when one interpretation leads to absurd results, that is certainly a reason to reject it. (See *Big Creek Lumber II, supra, 38 Cal.4th at p. 1156* [rejecting interpretation of timber statute because it "could lead to absurd results"].)

We have already seen that California offers two alternative forms of redressing violations of ADAAG's, which, if read in tandem, make perfect sense. On the other hand, reading *section 52* as Gunther would have us means that *section 54.3* becomes superfluous, a result "absurd" itself.

However, the federal district courts have accumulated some experience as to the "consequences that flow" from Gunther's interpretation, because his view was expressed by a panel of the Ninth Circuit in 2004 (and, we explain in the next part of this opinion, without much actual analysis or any confrontation with the language in *section 52*, or the havoc it would create with the balance created by the Legislature between *section 52* and *section 54.3*). And what they have discovered is that the Gunther rewrite of *section 52* has led to some gross abuses of the judicial system and small businesses. [34]

[34]    Respondent Lin has asked this court to take judicial notice of some 28 lawsuits which Gunther

himself filed between August 2003 and November 2004, plus points us to admissions by Gunther to the effect that he deliberately seeks out small businesses to bring ADA suits against them. Since the abuses that can occur under Gunther's interpretation of *section 52* are well documented without any references to his own personal conduct, we decline the request to take judicial notice.

For example, in *Doran v. Del Taco, Inc.* (C.D.Cal. 2006) 2006 WL 2037942, the plaintiff had sued so many fast food chains that he couldn't keep them all straight. (*2006 WL 2037942 at p. \*9.*) He was trying to sue a particular Del Taco restaurant 500 miles from his home before ever visiting it. His incentive was the Gunther reading of the *section 52* that would allow for a minimum $ 4,000 penalty for unintentional technical violations of ADAAG's. The federal district court lamented the abuses of the ADA: "Despite the important mission of the ADA, there are those individuals who would abuse its private cause of action provision by filing lawsuits solely with the intent to profit financially." (*2006 WL 2037942 at p. \*5.*) The court noted that "rather than informing the businesses of the violations and attempting to remedy them, lawsuits are filed and damage awards are requested." (*2006 WL 2037942 at p. \*6*, quoting *Doran v. Del Taco, Inc.* (C.D.Cal. 2005) 373 F. Supp. 2d 1028, 1030.*)

Another federal court (operating on the assumption that even technical violations of the ADAAG's are subject to *section 52*) put it this way: "However, enterprising plaintiffs (and their attorneys) have found a way to circumvent the will of Congress by seeking money damages while retaining federal jurisdiction. Because a violation of the ADA also constitutes a violation of California's Unruh Civil Rights Act, *Cal. Civ.Code § 51(f)*, and the California Disabled Persons Act ('CDPA'), *Cal. Civ.Code § 54(c)*, Plaintiffs can sue in federal court for injunctive relief under the ADA, and tack on state law claims for money damages under the Unruh Act and CDPA. *See, e.g., Moeller v. Taco Bell Corp., 220 F.R.D. 604, 607 (N.D.Cal.2004).*" (*Molski v. Mandarin Touch Restaurant* (2004) 347 F. Supp. 2d 860, 862-863*; see also *Rodriguez v. Investco, L.L.C.* (M.D.Fla. 2004) 305 F. Supp. 2d 1278, 1280-1281 [ability to profit from the ADA has given rise to a "cottage industry"].)

The irony here is that by adopting Gunther's reading

of *section 52* courts have in effect read *section 54.3* out of the scheme of compliance with ADAAG's. In doing so the rational balance now established in the law calibrating the "punishment" with the "crime"--for intentional violations, the penalty is four times greater than for unintentional violations--is wholly undone. That balance can make the difference between a small business making a technical correction (e.g., moving a mirror down) or going out of business altogether. (See Becker, *Private Enforcement of the Americans With Disabilities Act Via Serial Litigation: Abusive or Commendable, supra, 17 Hastings Women's L.J. 93, 111* [noting that a drive-in restaurant in Salinas went out of business after being sued by vexatious litigant Molski; also noting closing of Chinese restaurant in Stockton after ADA suit].)

We absolutely know that reading *section 52, subdivision (a)* to require intentional discrimination is *a* valid interpretation of the statute--that is the least one can take away from the *Harris* decision. Even assuming, however, for sake of argument that such a reading is not *the only* valid interpretation, there is really is no choice between competing interpretations. Gunther's proffered interpretation (no requirement of intentional discrimination) opens the door for abusive litigation; the alternative interpretation respects the need for compliance--nonintentional violations still carry a minimum penalty under *section 54.3*--while not creating the incentive for abuse, much less sabotage. We cannot believe that the Legislature ever intended to create an incentive for that.

F. The Two Federal Court Decisions Construing State Law on the Issue Are Not Persuasive to the Degree That They Imply Section 52 Does Not Require Discriminatory Intent

Two federal cases have confronted Unruh Civil Rights Act claims in connection with defenses based on a lack of intentional discrimination. The procedural context of one of the cases, a federal district court decision, *Presta v. Peninsula Corridor Joint Powers Bd. (N.D.Cal. 1998) 16 F. Supp. 2d 1134 (Presta)*, really didn't focus the court on damages pursuant to *section 52*. *Presta* is, strictly speaking, distinguishable from our conclusion today--indeed *supports* it to the degree that it recognizes that injunctive relief is obtainable under the Unruh Civil Rights Act for unintentional violations of the ADA. Only if one teases out an implication in the decision--and it's pretty oblique if it's there--that the plaintiff might have

also been seeking monetary claims pursuant to *section 52* would it contradict our conclusion today.

The other case, *Lentini v. California Center for the Arts (9th Cir. 2004) 370 F.3d 837 (Lentini)*, is indeed incompatible with our decision today, because there the federal intermediate appellate court, in the one brief paragraph that it devoted to the issue, basically refused to follow what our own state Supreme Court said in *Harris*. As we explain below, the *Lentini* court's analysis cannot be considered an accurate statement of California law. But first we analyze *Presta*, since the panel of the Ninth Circuit that wrote *Lentini* purported to follow the *Presta* decision.

We should note at the outset, however, that neither *Presta* nor *Lentini* cases involved a technical, unintentional violation of an ADAAG. Both arose out of situations where a human being acting for the defendant had to make a conscious decision as to how to proceed given the presence of a person with a disability. Neither court faced the issue of intentionality for a "violation" of *section 51* in the acute way that we do now.

In *Presta* the facts were extremely simple: On numerous occasions the plaintiff, a person of severely limited mobility, was not given sufficient time to board and disembark an Amtrak train, and in fact was treated "rudely when she asked for assistance." (*Presta, supra, 16 F. Supp. 2d at p. 1135*.) The plaintiff brought an ADA action in federal court, and appended to it an Unruh Civil Rights Act violation claim as well as to a Disabled Persons Act claim under *section 54*. The court only described the plaintiff's quest for relief under the Unruh Civil Rights Act as a "claim." (See *16 F.Supp.2d at p. 1135* ["In this lawsuit, Presta brings claims of common law negligence, and violations of Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act of 1973, the *California Civil Code § 54* ('California Public Accommodations Act') and *California Civil Code § 51* ('Unruh Civil Rights Act')."].) One finds no reference in the opinion anywhere to a claim for minimum penalties under *section 52*. In fact, the reference to *section 54* would create an inference that any minimum penalties (at least for unintentional conduct) the plaintiff was seeking would have been pursuant to *section 54.3*.

A dispute over jury instructions prompted the federal district court judge to write a short opinion slated for publication in the Federal Supplement over whether an

Unruh Civil Rights Act claim requires a plaintiff to prove "that the defendant harbored discriminatory intent." (See *Presta, supra, 16 F. Supp. 2d at p. 1135*.)

In rejecting defendant jury instructions which would have told the jury that plaintiff had to show the " 'discrimination was unreasonable, arbitrary, or invidious' " (*Presta, supra, 16 F.Supp.2d at p. 1136*), the court reasoned that the federal ADA (specifically title II, *42 U.S.C. § 12132*) was intended to guard "against both intentional discrimination and simple exclusion from services resulting not from intentional discriminatory acts, but rather from inaction, thoughtlessness, or equal treatment when particular accommodations are necessary." (*Presta, supra, 16 F. Supp. 2d at p. 1136*, citing *Crowder v. Kitagawa* (9th Cir. 1996) 81 F.3d 1480, 1483.)

When the court addressed the 1992 addition of the language now constituting *subdivision (f)* to *section 51*, it stated: " 'The plain language of the amendment clearly incorporates the entire ADA into *§ 51* ... The only plausible interpretation is that the amendment makes *§ 51* coextensive with the ADA.' *McCormack v. Advanced Micro Devices*, 1994 WL 715655 (N.D.Cal.). Because the Unruh Civil Rights Act has adopted the full expanse of the ADA, it must follow, that the same standards for liability apply under both Acts. Accordingly, if Plaintiff need not demonstrate discriminatory intent to prove a claim under the ADA, she similarly need not show such intent to prevail under the Unruh Act." (*Presta, supra, 16 F. Supp. 2d at pp. 1135-1136*.) And with that it rejected the defendant's jury instructions.

The *Presta* opinion never mentioned the *Harris* decision in connection with its determination that Unruh Civil Rights Act claims pursuant to violations of the ADA could be pressed without a showing of intent. But then it did not have to. As we have shown above, claims for injunctive relief for ADA violations under the Unruh Civil Rights Act do indeed *not* require discriminatory intent. The *Presta* decision did cite *Harris* for its historical observations about the Unruh Civil Rights Act (see *Presta, supra, 16 F. Supp. 2d at p. 1135*), but that is as far as it went. The decision never confronted what *Harris* had said about the triggering language in *section 52* with the plaintiff's *section 51* Unruh Civil Rights Act claims.

Now to *Lentini*. There, a quadriplegic woman in a wheelchair used a Shih Tzu/Poodle as a "service dog" for

protection and retrieval of small dropped items. She attended two performances at an "intimate" (see *Lentini, supra, 370 F.3d at p. 842*) performing arts center, where the dog made noises--but the trial court would later determine that the noises were to alert its owner as to a possibly dangerous situation. No customers made complaints on either occasion, but the house manager, on a third visit, refused the patron admittance to the theater with the dog, and in fact called the police and had a citizen's arrest made when she refused to leave. (See *id. at pp. 840-841*.) The ejection was the result of an unwritten venue policy to exclude service animals who had made noises at prior events regardless of the level of noise and regardless of whether the noise was made for a " 'legitimate reason,' " such as an " 'oncoming medical emergency or dangerous condition.' " (*Id. at p. 842*.)

The patron sued the performing arts center, the house manager and the director of sales and services under the ADA, the Unruh Civil Rights Act *and* the Disabled Persons Act. (The court never confronted the problem of the election between *section 52* and *section 54.3* as required by *section 54.3, subdivision (c)*.) Most of the case as it confronted the Ninth Circuit on appeal concerned the propriety of the injunctive relief given the patron by the federal district court. It had ordered the theater to modify its policy so as not to exclude service animals who had made noises on previous occasions *if* the noise was legitimate (to benefit the disabled owner); it also imposed damages, including making the house manager individually liable for $ 5,000.

On appeal, the court specifically declined to address the argument that the defendants had not actually violated the ADA, since it had not been raised until the reply brief. (*Lentini, supra, 370 F.3d at p. 843, fn. 6.*) It did, however, conclude that a regulation requiring modification of policies and practices to permit " 'the broadest feasible access be provided to service animals in all places of public accommodation' " (*id. at p. 843*, quoting 28 C.F.R. pt. 36, App. B) justified the order, in effect assuming that the defendants had indeed violated the ADA.

Then it turned to the issue of damages. Damages, of course, could not be justified under federal law, so the court looked to state law, namely the Unruh Civil Rights Act. The trial court had found that "appellants" (including the theater itself, the director of sales and services and the house manager) did not intentionally discriminate against

the patron, though the Ninth Circuit would conclude otherwise as to the house manager. (See *Lentini, supra, 370 F.3d at p. 846* and fn. 9, and *pp. 849-851.*) And the other human actor--the director of sales and services--had specifically directed the staff not to let the patron back in after he heard a noise at one of the two prior concerts. (*Id. at p. 849.*) Indeed, he later lied to the assistant director of sales about the reason for the ejection (falsely claiming that the patron had failed to present her ticket). (See *id. at p. 849.*)

The court first established that a plaintiff need not show intentional discrimination under the ADA (see *Lentini, supra, 370 F.3d at p. 846* ["It is undisputed that a plaintiff need not show intentional discrimination in order to make out a violation of the ADA."]) and then, in a single paragraph's analysis, concluded that "regardless of whether *Harris* may continue to have relevance to other Unruh Act suits, no showing of intentional discrimination is required where the Unruh Act violation is premised on an ADA violation." (*Id. at p. 847.*)

The *Lentini* analysis was so short that we may quote it in full now: "This result is mandated by the plain meaning of the Unruh Act's language, which states that a violation of the ADA is, *per se*, a violation of the Unruh Act. *See Biehl v. C.I.R., 351 F.3d 982, 986 (9th Cir. 2003)* ('Statutory interpretation begins with the plain meaning of the statute's language.' [citation and quotation marks omitted]). 'Because the Unruh Act has adopted the full expanse of the ADA, it must follow, that the same standards for liability apply under both Acts.' *Presta, 16 F. Supp. 2d at 1135.* Therefore, we affirm the district court's conclusion that, insofar as the appellants violated the ADA, a showing of intentional discrimination was not required in order to award damages under the Unruh Act." (*Lentini, supra, 370 F.3d at p. 847.*)

In a tag end footnote, the Ninth Circuit panel stated that given its conclusion about the Unruh Civil Rights Act, "we need not address Lentini's alternative argument that she can recover the relevant damages under the Disabled Persons Act without a showing of intentional discrimination." (*Lentini, supra, 370 F.3d at p. 847, fn. 10.*)

To the degree that *Presta* or *Lentini* is read as authorizing monetary damage and minimum damage claims under *section 52*, it is not persuasive as a statement of state law, for these reasons:

(1) Neither case ever confronted the actual language *in section 52* construed by *Harris* that triggers the minimum penalty of $ 4,000. The district court *Presta* decision did not confront what *Harris* had said about the need for intentional conduct at all, and *Lentini* felt that it did not need to confront of *how subdivision (f) of section 51* could somehow transform language, which *Harris* had said contemplated intentional discrimination, into language which contemplated unintentional conduct.

(2) Neither case dealt with the fact that the Legislature did not alter the triggering language of *section 52* when it was considering legislation that involved *section 52* and had already been construed by the state's highest court to require intentional discrimination. Neither case, in that regard, made any attempt to reconcile *section 52* as already construed by the state's highest court with the addition of subdivision (f) to *section 51.*

(3) Neither case showed any recognition of the two alternative--and under *section 54.3, subdivision (c) mutually exclusive*--means of enforcing the ADA under state law, depending on the intentionality (*§ 52*) or unintentionality (*§ 54.3*). The *Lentini* decision, in fact, treated the two as cumulative, when the plain language of *section 54.3, subdivision (c)* is that they are mutually exclusive. (*Lentini* would have been on much sounder footing if it had upheld the damage award based on *§ 54.3, subd. (c)* instead.)

(4) Neither case confronted the problem that its implied reading of *section 52* rendered another part of state law redundant as regards unintentional violations of the ADA.

(5) Neither case dealt with the problem that even if their own implied reading of *section 52* was plausible, their interpretation had the consequence of encouraging abusive litigation, a consequence we doubt the Legislature intended. Their failure to discuss at all the possibility that the Legislature's 1992 amendment did not disturb the holding in *Harris* further undermines their persuasive authority.

Ironically, another consequence is that the *Lentini* decision has resulted in the inundation of the federal courts with litigation in which the quest for the minimum $ 4,000 penalty under state law predominates. (See *Molski v. Hitching Post 1 Restaurant, Inc. (C.D.Cal. 2005) 2005 WL 3952248* [because plaintiff's state Unruh

Civil Rights Act claim "substantially predominate[d] over his ADA claim," court declined to exercise supplemental jurisdictions over the plaintiff's state law claims].)

In essence, state law claims have become the tails that wag the dog of federal ADA litigation in California, as plaintiffs seek to cash in on the higher minimum penalties provided by *section 52*, ignoring *section 54.3*. But that is a federal procedural problem that we leave for the federal courts to resolve themselves. For our part, however, we cannot consider either *Presta* (at least to the degree that it can be arguably read to provide for § 52 penalties for unintentional acts), or *Lentini*, to be accurate statements of our own state law and we respectfully decline to follow them.

## IV. DISPOSITION

Gunther could have sued Lin based on Lin's unintentional ADA violations, but recovered the smaller statutory minimum penalty under *section 54.3*. Rather, he elected to try to obtain the larger statutory minimum penalty under *section 52*, but that remedy is reserved for intentional violations. California law (quite logically) does not allow plaintiffs to proceed under both statutes, and Gunther failed to present any evidence that the defendant had intentionally discriminated against him as required by *section 52*.

The judgment is affirmed. Costs rest with the discretion of this court. Justice is well served in this case by an award of costs against Gunther and to the prevailing respondent.

Rylaarsdam, J., and Aronson, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 17, 2007, S148359.

Moreno, J., did not participate therein.

Exhibit D

1

2

3

4

5

6

7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10   DIANE CROSS,                           CASE NO. 06 CV 2543 JM (RBB)

11                                          **ORDER GRANTING MOTION TO**
                                Plaintiff,  **DISMISS THE SUPPLEMENTAL**
12         vs.                              **STATE CLAIMS**

13   PACIFIC COAST PLAZA INVESTMENTS,       **[Docket No. 29]**
14   L.P. et al.,
                               Defendants.
15

16

17   I.    **BACKGROUND**

18         This is a disability discrimination case alleging that defendants, various retail establishments,

19   have violated federal and state law by not removing architectural barriers which prevent Plaintiff, an

20   alleged disabled individual, from enjoying full and equal access to defendants' stores. Plaintiff brings

21   claims arising under the ADA, the California Unruh Civil Rights Act (the "Unruh Act"), the California

22   Disabled Persons Act ("DPA"), and the Health and Safety Code.   Pending before the court is

23   defendant SWH Corporation's, doing business as Mimi's Café ("MC"), Rule 12(b)(1) motion to

24   dismiss the supplemental state claims for lack of subject matter jurisdiction. See Docket No. 29. Co-

25   defendants Starbucks Corporation ("Starbucks") and Bed, Bath & Beyond join in MC's motion. See

26   Docket Nos. 31, 48.

27         Plaintiff alleges that she is a paraplegic and therefore "physically disabled" within the meaning

28   of federal and state law. Comp. ¶ 23. She also alleges that MC "is an establishment serving food and

-1-

**EXHIBIT** D

06cv2543

1  drink, open to the public, which is intended for nonresidential use and whose operation affects

2  commerce." Id. ¶ 28. During an alleged visit to MC, Plaintiff contends she encountered physical and

3  intangible barriers that prevented her from enjoying full and equal access to MC and deter her from

4  returning. Id. ¶ 45. The same allegations are made with respect to Starbucks and Bed, Bath &

5  Beyond. Id. ¶¶ 43, 47. Plaintiff does not allege that MC, Starbucks, or Bed, Bath & Beyond

6  intended to discriminate against her on the basis of her disability. Plaintiff seeks relief in the form of

7  damages,[1] injunctive and declaratory relief, and attorney's fees and costs.

8        MC makes two arguments as to why the court should dismiss Plaintiff's supplemental state

9  claims. First, MC contends that Plaintiff is a "tester" and that California law does not confer standing

10 on testers to bring discrimination actions. Second, MC argues that the state claims raise novel or

11 complex issues of California law and therefore the court should decline to exercise supplemental

12 jurisdiction over them pursuant to 28 U.S.C. § 1367(c)(1).

13 **II.    STANDARD OF REVIEW**

14       A party may move the court to dismiss an action for lack of subject matter jurisdiction. Fed.

15 R. Civ. P. 12(b)(1). When the moving party argues that the allegations are insufficient to confer

16 subject matter jurisdiction as a matter of law, which is the situation here, the court accepts the

17 allegations as true. Whisnant v. United States, 400 F.3d 1177, 1179 (9th Cir. 2005). "The party

18 seeking to invoke the court's jurisdiction bears the burden of establishing that jurisdiction exists."

19 Scott v. Breeland, 792 F.2d 925, 927 (9th Cir. 1986).

20 **III.   STANDING**

21       Under both federal and California law, a plaintiff must meet the jurisdictional requirement of

22 standing. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992); Municipal Court v. Superior

23 Court, 5 Cal.4th 1126, 1132 (1993) (providing that if a plaintiff lacks standing, California courts will

24 decline to address the merits). A plaintiff has standing when, among other things, he has suffered an

25 injury in fact that is concrete and particularized as well as actual or imminent. Lujan, 504 U.S. at 560;

26

27  ───────────────

   [1]Plaintiff seeks damages pursuant to California law only. The ADA does not permit private recovery

28 of damages. See 42 U.S.C. § 12188(a); Pickern v. Holiday Quality Foods, Inc., 293 F.3d 1133, 1136 (9th Cir. 2002).

1　see also Schmier v. Supreme Court, 78 Cal. App. 4th 703, 707 (2000) ("A person who invokes the

2　judicial process lacks standing if he . . . does not have a real interest in the ultimate adjudication

3　because [he] has neither suffered nor is about to suffer any injury of sufficient magnitude reasonably

4　to assure that all of the relevant facts and issues will be adequately presented.") (internal quotations

5　omitted).

6　　　　In the context of this case, a "tester" is someone who, falsely posing as a disabled individual,

7　visits a place of public accommodation for the express purpose of gathering evidence of discrimination

8　in order to bring a lawsuit. See Blumhorst v. Jewish Family Serv. of Los Angeles, 126 Cal. App. 4th

9　993, 997 n.2 (2005). Testers who do not suffer personal injury lack standing to bring a discrimination

10　claim. See id. at 1003.

11　　　　Since MC argues that Plaintiff lacks standing as a matter of law because California does not

12　confer standing on testers absent personal injury, the court accepts the allegations set forth in the

13　complaint as true. Whisnant, 400 F.3d at 1179. Plaintiff alleges that she is disabled. Comp. ¶ 23.

14　Plaintiff further alleges that she visited MC, encountered architectural barriers there, and is deterred

15　from returning. Id. ¶ 45. Plaintiff makes the same allegations with respect to defendants Starbucks

16　and Bed, Bath & Beyond. Id. ¶¶ 43, 47. The court finds that these allegations are sufficient to

17　establish standing at this stage in the litigation. Org. for the Advancement of Minorities with

18　Disabilities v. Brick Oven Restaurant, 406 F. Supp. 2d 1120, 1126-27 (S.D. Cal. 2005) (Gonzalez,

19　C.J., presiding) (finding allegations of injury sufficient to withstand challenge to standing at pleading

20　stages). There is nothing in the complaint alleging that Plaintiff is a tester who did not suffer personal

21　injury as a result of the events alleged.

22　　　　MC contends Plaintiff is a "tester" because in this single action, Plaintiff has sued all of the

23　businesses in the same shopping center and has filed numerous ADA lawsuits in the past. Other than

24　to accuse Plaintiff of drafting a "shotgun style Complaint", MC points to no specific allegation that

25　would support finding that Plaintiff is a tester. Mot. at 1. Furthermore, the fact that Plaintiff may have

26　filed other lawsuits is not probative of Plaintiff's standing at this stage in the case. See Brick Oven

27　Restaurant, 406 F. Supp. 2d at 1127, 1131 (finding ADA plaintiff had established standing at pleading

28　stages even though plaintiff had filed 178 ADA cases in the past).

<center>- 3 -</center>

1    MC cites Molski v. Mandarin Touch Restaurant, 347 F. Supp. 2d 860, 862-63 (C.D. Cal.

2    2004), and Wilson v. Costco Wholesale Corp., 426 F. Supp. 2d 1115, 1122-23 (S.D. Cal. 2006) in

3    support of its argument that Plaintiff has suffered no actual injury and therefore her case should be

4    dismissed for lack of standing. Molski, however, involved the defendant's motion to declare the

5    plaintiff a vexatious litigant, and it therefore has no application here. Wilson, which found that the

6    plaintiff-patron lacked standing to sue for violations of the ADA, 426 F. Supp. 2d at 1123, was

7    decided on the parties' cross motions for summary judgment. By contrast, this case is at the pleading

8    stages and therefore the court, in deciding the standing issue, looks only to the sufficiency of the

9    allegations. Whisnant, 400 F.3d at 1179. In sum, MC's cited authorities do not support its argument.

10   Accordingly, the motion to dismiss the supplemental state claims for lack of standing is denied.

11   The complaint sufficiently alleges that Plaintiff has suffered personal injury. The next issue raised

12   by MC is whether the court should decline to exercise its supplemental jurisdiction in light of the state

13   law issues presented.

14   **IV.   SUPPLEMENTAL JURISDICTION**

15   In an action over which it has original jurisdiction, a federal court must exercise supplemental

16   jurisdiction over all other state claims that arise out of the same common nucleus of operative facts.

17   See 28 U.S.C. § 1367(a); Executive Software N. Am., Inc. v. United States Dist. Court, 24 F.3d 1545,

18   1556 (9th Cir. 1994).   However, a court may decline to exercise supplemental jurisdiction if:

19   (1) the claim raises a novel or complex issue of State law,

20   (2) the claim substantially predominates over the claim or claims over which the
     district court has original jurisdiction,

21
22   (3) the district court has dismissed all claims over which it has original
     jurisdiction, or

23   (4) in exceptional circumstances, there are other compelling reasons for declining
     jurisdiction.

24

25   § 1367(c).

26   Here, Plaintiff brings an ADA claim, a claim over which this court has original jurisdiction.

27   28 U.S.C. §§ 1331, 1343.   Therefore, the court must exercise supplemental jurisdiction over the

28   California claims so long as they arise out of the same common nucleus of operative facts giving rise

- 4 -

06cv2543

1   to the ADA claim, which in this case they clearly do. The court may, however, decline to exercise its

2   supplemental jurisdiction if one of the conditions delineated in § 1367(c) is present in the case.

3          Here, MC argues that Plaintiff's state claims raise a novel or complex issue of state law in light

4   of the recent California decision Gunther v. Lin, 144 Cal. App. 4th 223 (2006). This is because,

5   according to MC, the holding in Gunther is in direct conflict with Lentini v. California Center for the

6   Arts, 370 F.3d 837 (9th Cir. 2004), in which the Ninth Circuit construed the interplay between the

7   Unruh Act and the ADA. Before addressing the merits of this argument, a brief discussion of the DPA

8   and the Unruh Act is necessary.

9          **A.   The DPA and the Unruh Act[2]**

10          The DPA provides in relevant part,

11              Individuals with disabilities or medical conditions have the same right as the
                general public to the full and free use of the streets, highways, sidewalks,
12              walkways, public buildings, medical facilities, including hospitals, clinics, and
                physicians' offices, public facilities, and other public places.
13

14   Cal. Civ. Code § 54(a). Private plaintiffs may recover no less than $1,000 statutory damages "for each

15   offense" of the DPA pursuant to Cal. Civ. Code § 54.3(a). The Unruh Act in turn provides that

16              All persons within the jurisdiction of this state are free and equal, and no matter
                what their sex, race, color, religion, ancestry, national origin, disability, medical
17              condition, marital status, or sexual orientation are entitled to the full and equal
                accommodations, advantages, facilities, privileges, or services in all business
18              establishments of every kind whatsoever.

19   Id. § 51(b). Pursuant to Cal. Civ. Code § 52(a), private plaintiffs may recover no less than $4,000 "for

20   each and every offense" from defendants who violate the Unruh Act.      A violation of the ADA is

21   automatically deemed a violation of the DPA and the Unruh Act. Id. §§ 51(f), 54(c). A meritorious

22   ADA claim does not require proof of intent. See 42 U.S.C. § 12182(b)(2)(A)(iv); Lentini, 370 F.3d

23   at 846-47. In contrast, the Unruh Act requires the plaintiff to prove intentional discrimination. Harris

24   v. Capital Growth Investors XIV, 52 Cal. 3d 1142, 1149 (1991); Gunther, 144 Cal. App. 4th at 233.

25   _____

26          [2]Plaintiff's Health and Safety Code § 19953 claim is for an alleged violation of § 19955(a), which
     provides that public accommodations or facilities shall be accessible to and usable by persons with disabilities.
27   Cal. Health & Safety Code § 19955(a); Cal. Gov. Code § 4450. The parties do not discuss the propriety of
     exercising supplemental jurisdiction over this claim. However, since the underlying facts alleged with respect
28   to all three state claims are the same, the court decides the supplemental jurisdiction issue with respect to the
     Health and Safety Code claim based on the parties' DPA and Unruh Act arguments.

1      In Lentini, the Ninth Circuit, acknowledging that no binding authority yet existed on the

2 question, held that when a plaintiff prevails in federal court on an ADA claim without proof of

3 intentional discrimination, the plaintiff may also recover on his supplemental Unruh Act claim, even

4 though a successful Unruh Act claim adjudicated separately would have required proof of intent.

5 Lentini, 370 F.3d at 847. This was so in light of "the plain meaning of the Unruh Act's language,

6 which states that a violation of the ADA is, per se, a violation of the Unruh Act." Id.; accord Mantic

7 Ashanti's Cause v. Darwish Plaza, 2006 U.S. Dist. LEXIS 33650, *19 n.3 (S.D. Cal. Apr. 21, 2006);

8 Deanda v. Savings Investment, Inc., 2005 U.S. Dist. LEXIS 40091, *23 (S.D. Cal. Nov. 8, 2005).

9    **B.**    **The _Gunther_ Decision**

10      MC argues that the court should decline to exercise supplemental jurisdiction because Gunther

11 shows that the relevant California law is unsettled. This is so, MC contends, because (1) a petition

12 has been filed with the California Supreme Court for review of Gunther, (2) numerous requests for

13 depublication of Gunther have been filed, and (3) Gunther held that Lentini flew in the face of the

14 California Supreme Court's decision in Harris, supra, when the Ninth Circuit awarded Unruh Act

15 remedies for unintentional conduct, even though an ADA violation is per se an Unruh Act violation.

16 Gunther, 144 Cal. App. 4th at 255 ("To the degree that Presta or Lentini is read as authorizing money

17 damage and minimum damage claims under section 52, it is not persuasive as a statement of state

18 law[.]"); see also id. at 256 ("For our part, however, we cannot consider . . . Lentini, to be [an]

19 accurate statement[] of our own state law and we respectfully decline to follow [it].").

20      MC's first two arguments are moot. On January 17, 2007, the California Supreme Court

21 denied the petition for review as well as the request for depublication. Gunther v. Lin, 2007 Cal.

22 LEXIS 350 (Cal. Jan. 17, 2007). MC's third argument, however, has merit. As set forth below,

23 Gunther demonstrates the following conundrum in the law.

24      Section 51(f) of the California Civil Code provides that a defendant violates the Unruh Act

25 whenever it violates the ADA. As stated earlier, a defendant can violate the ADA without intending

26 to discriminate. By contrast, successful Unruh Act claims require proof of intent. Harris, 52 Cal. 3d

27 at 1149. However, according to the Ninth Circuit, such proof is not required when liability is

28 premised on an ADA violation. Lentini, 370 F.3d at 847. In direct contrast to Lentini, Gunther held

1    that Unruh Act remedies are not available absent proof of intent, even when a defendant is found to

2    have violated the ADA.  Gunther, 144 Cal. App. 4th at 324-25.  However, the result under

3    Gunther–which leaves a successful ADA plaintiff without a corresponding Unruh Act

4    remedy–undermines the California legislature's purpose in passing section 51(f) to provide that a

5    violation of the ADA is also a violation of the Unruh Act.  The court presumes that the California

6    legislature did not intend section 51(f) to be a law that is all bark and no bite.

7        As circumstances presently exist, this court is faced with irreconcilable authorities based on

8    the current status of state law.  On the one hand, the court is bound by Lentini, which would allow

9    Plaintiff to recover for an unintentional Unruh Act violation if MC were found to have violated the

10   ADA, whether intentionally or unintentionally.  On the other hand, according to Gunther, Lentini is

11   an incorrect interpretation of the Unruh Act in this regard.  The California Supreme Court has declined

12   to review Gunther and has also declined requests for depublication.  The court cannot adhere to the

13   teachings of both Lentini and Gunther.  Acknowledging the issues of comity presented in a similar

14   ADA case, Chief Judge Gonzalez in Brick Oven Restaurant found "that the remedial provisions of the

15   Unruh Act and the California DPA present novel and complex issues of unresolved state law.

16   Ultimately, this is a matter of state law, which is better left to the California courts."  Brick Oven

17   Restaurant, 406 F. Supp. 2d at 1130.  Gunther, decided after Brick Oven Restaurant, shows that the

18   comity interests have become more, not less, compelling over time as the courts struggle to resolve

19   what is at the moment an irreconcilable tension between the ADA and the Unruh Act.  In sum, Lentini

20   and Gunther show that federal and state interpretation of the Unruh Act have diverged to such a degree

21   that declining supplemental jurisdiction is appropriate in this case.[3]

22        Plaintiff has not made any persuasive argument as to why the court should retain its

23   supplemental jurisdiction.  Relying on Modern Dev. Co. v. Navigators Ins. Co., 111 Cal. App. 4th 932

24   (2003), Plaintiff contends that the Unruh Act only requires proof of intent that the architectural layout

25   be the way it was, not proof of intent to discriminate against disabled persons.  Oppo. at 9.  Not only

26

27        _____

28        [3] Even though this court has the option of certifying the issue to the California Supreme Court, there
     is no reason to think exercising this option would be helpful in light of that court's recent denial of review in
     Gunther.

-7-

1   is this argument irrelevant to issues raised by <u>Gunther</u> and <u>Lentini</u>, but Plaintiff cites text from <u>Modern</u>

2   <u>Development</u> that is actually the defendant's brief and not the holding of the court. <u>Id.; Modern Dev.,</u>

3   111 Cal. App. 4th at 941.

4        Plaintiff also argues that even if the court were to find the state claims raise novel or complex

5   issues of state law, it must still determine whether the exercise of its discretion to decline supplemental

6   jurisdiction would most sensibly accommodate the values of economy, convenience, fairness, and

7   comity. <u>Executive Software</u>, 24 F.3d at 1552. It would undoubtedly be more convenient to have this

8   suit adjudicated in one action. Moreover, it would not be erroneous to retain supplemental jurisdiction

9   since here the federal and state claims arise out of the same common nucleus of operative facts. On

10   balance, however, the novelty and complexity of state law is such that comity supports the granting

11   of the motion and California courts to resolving the issue. <u>Brick Oven Restaurant</u>, 406 F. Supp. 2d

12   at 1130.

13        The briefs cite similar ADA cases from this district on the supplemental jurisdiction issue,

14   most of them favoring Plaintiff and one favoring MC. <u>Compare</u> <u>Brick Oven Restaurant</u>, 406 F. Supp.

15   2d at 1132 (declining to exercise supplemental jurisdiction) <u>with</u> <u>Wilson v. PFS LLC</u>, 2006 WL

16   3841517, *6 (S.D. Cal. Nov. 2, 2006) (finding no exceptional circumstances for declining to exercise

17   supplemental jurisdiction over California claims in ADA case); <u>Feezor v. Wal-Mart Stores, Inc.</u>, 2006

18   WL 220152, *4 (S.D. Cal. Jan. 25, 2006) (same); <u>Chavez v. Suzuki</u>, 2005 WL 3477848, *2 (S.D. Cal.

19   Nov. 30, 2005) ("Although the Unruh Act and DPA claims may implicate issues that remain to be

20   resolved under state law-most notably, how to determine 'each offense' for purposes of damages-the

21   Court does not find that these issues are of such complexity or centrality that the Court must surrender

22   jurisdiction."); <u>Wilson v. Wal-Mart Stores, Inc.</u>, 2005 WL 3477827, *3 (S.D. Cal. Oct. 12, 2005)

23   (rejecting notion that availability of damages under California but not under federal law is a basis for

24   declining to exercise supplemental jurisdiction). However, these cases were decided before <u>Gunther</u>,

25   which now provides a new and compelling basis for declining supplemental jurisdiction in this case.

26   / / /

27   / / /

28   / / /

1   Finally, although the tension between <u>Lentini</u> and <u>Gunther</u> applies only to Plaintiff's Unruh

2   Act claim, the court finds that the most efficient course is to also dismiss the DPA and Health and

3   Safety Code claims as well. This would allow the state court to adjudicate Plaintiff's state claims in

4   their entirety.

5   **V.    CONCLUSION**

6   Essentially, the California state courts, through the <u>Gunther</u> case, which the California

7   Supreme Court has declined to hear, has told the federal courts, "you got it wrong," when <u>Lentini</u> was

8   decided. The "it" in <u>Lentini</u> was an interpretation of California state law and an attempt to reconcile

9   the Unruh Act's remedies and sanctions for intentional discrimination, when liability is premised on

10  an unintentional violation of the ADA, with the ADA itself, which does not require proof of

11  intentional discrimination. Given considerations of comity and the other "compelling reasons"

12  articulated above, "the ball" is now in the California courts on this conundrum. The motion to dismiss

13  the supplemental state claims is **GRANTED**. The court **DISMISSES** without prejudice all of

14  Plaintiff's state claims pursuant to 28 U.S.C.  § 1367(c)(1).

15  **IT IS SO ORDERED.**

16

17  DATED:  March 6, 2007

18

19                                              Hon. Jeffrey T. Miller
                                                United States District Judge

20  cc: All Parties

21

22

23

24

25

26

27

28

- 9 -                                                                  06cv2543

Exhibit E

1

2

3

4

5

6

7

8    UNITED STATES DISTRICT COURT

9    FOR THE EASTERN DISTRICT OF CALIFORNIA

10    RONALD WILSON,

                        NO. CIV.S-05-1239 LKK/DAD

11

       Plaintiff,

12                         O R D E R

    v.

13

HARIA and GOGRI CORP. dba    **TO BE PUBLISHED**

14    JACK-IN-THE-BOX #551; OPT

GOLDEN HILLS VAC, LLC,

15

       Defendants.

16    _____/

17        Plaintiff alleges that defendant violated the Americans with

18    Disabilities Act ("ADA") and California's Unruh Civil Rights Act ("Unruh

19    Act") by failing to remove architectural barriers at its restaurant.

20    Pending before the court is plaintiff's motion for summary judgment.  The

21    court previously stayed the motion pending the potential resolution of

22    a question of state law by the California Supreme Court.[1]  This court now

23    _____

24        [1] As discussed below, the California Supreme Court

subsequently denied review of an intermediate appellate court

25    decision that could have provided definitive guidance on whether

plaintiffs must prove intentional disability discrimination under

26    the Unruh Act to obtain damages.

1

# EXHIBIT E

1  resolves the matter based on the parties papers and after oral argument.

2  For the reasons set forth below, the motion is granted.

3  ### I. Facts[2]

4      Plaintiff Ronald Wilson is a 70 year old disabled man.

5  Plaintiff suffers from severe idiopathic neuropathy, peripheral

6  neuropathy ("silent disease") with symptoms of ALS (a.k.a. Lou

7  Gehrig's disease), and motor-sensory neuropathy.[3]  Decl. of Ronald

8  Wilson ("Wilson Decl.") ¶ 3.  Because of his condition, plaintiff

9  experiences stiffness, muscle twitching, shaking, weakness, and

10  spasms.  Id.  When traveling in public, plaintiff uses a cane,

11  wheelchair, or both.[4]  Plaintiff also owns a van with a spinner knob

12  and has been issued a disability placard by the state of California.

13      Plaintiff regularly visits the defendant Haria and Gorgri

14  Corporation's restaurant, a Jack-in-the-Box.  He retained receipts to

15  the restaurant from thirteen separate visits over 2005-2006.  Wilson

16  Decl. ¶ 11.  In each of these visits, plaintiff alleges that there

17  were several architectural barriers in place that prevented plaintiff

18  from enjoying full and equal access to the goods and services at the

19  _____

20      [2] All facts are undisputed unless otherwise noted.

21      [3] At several points, defendant notes that the only evidence
supporting plaintiff's factual allegations is his own declaration.
22  This is, however, sufficient to meet plaintiff's initial burden on
summary judgment, and as defendant repeatedly fails to tender any
23  probative evidence in opposition, the court may appropriately treat
these allegations as effectively undisputed.
24
       [4] Defendant notes that, on one occasion in 2006, the owner and
25  operator of the restaurant allegedly observed plaintiff walking
without the assistance of a cane or a wheelchair.  Decl. of
26  Maheshkumar Gogri ("Maheshkumar Decl.") ¶ 4.

1  restaurant.

2     There is no dispute that after commencement of the instant suit,

3  at least some of these barriers were removed.[5] Plaintiff maintains,

4  however, that there are six outstanding barriers that had yet to be

5  remedied as of August 24, 2006. Wilson Decl. ¶ 16. Specifically,

6  plaintiff identified the following six barriers: (1) the cut-out curb

7  ramp had a slope of 8.8% at the top and 12.6% at the bottom; (2) the

8  door to the men's restroom did not have a 12-inch strike side

9  clearance on the push side, the door pressure was 12 pounds, and the

10 door did not open to a full ninety degrees; (3) the toilet paper

11 dispenser was 42 inches from the back wall; (4) the restroom

12 handle/lock was not accessible; (5) none of the accessible seating in

13 the restaurant was designated as accessible with signage; and (6) the

14 disabled parking space lacked the words "No Parking" painted in the

15 access aisle.  Id.

16    With respect to at least two of the barriers, defendant claims

17 that they have been remedied as of November 27, 2006 (the date that

18 the declaration of Maheshkumar Gogri was executed). First, defendant

19 contends that the words "no parking" are now painted in the access

20 aisle of the disabled parking spot. Gogri Decl. ¶ 11. Second,

21 defendant maintains that the toilet paper dispenser is now in

22 compliance with all regulations.  Id.  However, plaintiff visited the

23 restaurant on November 30, 2006 and took photographs that show that

24 _____

25     [5] Defendant does not dispute that these barriers were in
existence at the time of plaintiff's visits but merely claims that
26 they have since been remedied.

3

1  the dispenser is still 42 inches from the back wall.  Wilson Decl. II,

2  ¶ 3(c), Ex. E.

3      With respect to the issue of signage for accessible seating in

4  the restaurant, defendant contends that the placards are often stolen,

5  vandalized, or otherwise obscured by customers, and that it is the

6  policy of the restaurant to replace the placards in such

7  circumstances.  Id.  Accordingly, defendant states that if plaintiff

8  observed the absence of required signage, it was because the placards

9  were in the process of being replaced.  Id.  When plaintiff visited

10 the restaurant on November 30, 2006, he found that the signage was

11 still missing, and took photographs to document his observations.

12 Wilson Decl. II, ¶ 3(f), Ex. F.

13                          **II. Standard**

14      Summary judgment is appropriate when it is demonstrated that

15 there exists no genuine issue as to any material fact, and that the

16 moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

17 P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S. 144, 157

18 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853 (9th Cir. 1995).

19      Under summary judgment practice, the moving party

20      [A]lways bears the initial responsibility of informing
        the district court of the basis for its motion, and
21      identifying   those   portions   of   "the   pleadings,
        depositions, answers to interrogatories, and admissions
22      on file, together with the affidavits, if any," which it
        believes demonstrate the absence of a genuine issue of
23      material fact.

24 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "[W]here the

25 nonmoving party will bear the burden of proof at trial on a

26 dispositive issue, a summary judgment motion may properly be made in

                                   4

1   reliance solely on the 'pleadings, depositions, answers to

2   interrogatories, and admissions on file.'"  Id.  Indeed, summary

3   judgment should be entered, after adequate time for discovery and upon

4   motion, against a party who fails to make a showing sufficient to

5   establish the existence of an element essential to that party's case,

6   and on which that party will bear the burden of proof at trial.  See

7   id. at 322.  "[A] complete failure of proof concerning an essential

8   element of the nonmoving party's case necessarily renders all other

9   facts immaterial."  Id.  In such a circumstance, summary judgment

10  should be granted, "so long as whatever is before the district court

11  demonstrates that the standard for entry of summary judgment, as set

12  forth in Rule 56(c), is satisfied."  Id. at 323.

13      If the moving party meets its initial responsibility, the burden

14  then shifts to the opposing party to establish that a genuine issue as

15  to any material fact actually does exist.  Matsushita Elec. Indus. Co.

16  v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); see also First Nat'l

17  Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968); Secor

18  Ltd., 51 F.3d at 853.

19      In attempting to establish the existence of this factual

20  dispute, the opposing party may not rely upon the denials of its

21  pleadings, but is required to tender evidence of specific facts in the

22  form of affidavits, and/or admissible discovery material, in support

23  of its contention that the dispute exists.  Fed. R. Civ. P. 56(e);

24  Matsushita, 475 U.S. at 586 n.11; see also First Nat'l Bank, 391 U.S.

25  at 289; Rand v. Rowland, 154 F.3d 952, 954 (9th Cir. 1998).  The

26  opposing party must demonstrate that the fact in contention is

5

1    material, i.e., a fact that might affect the outcome of the suit under

2    the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248

3    (1986); <u>Owens v. Local No. 169, Ass'n of Western Pulp and Paper</u>

4    <u>Workers</u>, 971 F.2d 347, 355 (9th Cir. 1992) (quoting <u>T.W. Elec. Serv.,</u>

5    <u>Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir.

6    1987)), and that the dispute is genuine, i.e., the evidence is such

7    that a reasonable jury could return a verdict for the nonmoving party,

8    <u>Anderson</u>, 477 U.S. 248-49; <u>see also</u> <u>Cline v. Indus. Maint. Eng'g &</u>

9    <u>Contracting Co.</u>, 200 F.3d 1223, 1228 (9th Cir. 1999).

10         In the endeavor to establish the existence of a factual dispute,

11    the opposing party need not establish a material issue of fact

12    conclusively in its favor.  It is sufficient that "the claimed factual

13    dispute be shown to require a jury or judge to resolve the parties'

14    differing versions of the truth at trial."  <u>First Nat'l Bank</u>, 391 U.S.

15    at 290; <u>see also</u> <u>T.W. Elec. Serv.</u>, 809 F.2d at 631.  Thus, the

16    "purpose of summary judgment is to 'pierce the pleadings and to assess

17    the proof in order to see whether there is a genuine need for trial.'"

18    <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory

19    committee's note on 1963 amendments); <u>see also</u> <u>Int'l Union of</u>

20    <u>Bricklayers & Allied Craftsman Local Union No. 20 v. Martin Jaska,</u>

21    <u>Inc.</u>, 752 F.2d 1401, 1405 (9th Cir. 1985).

22         In resolving the summary judgment motion, the court examines the

23    pleadings, depositions, answers to interrogatories, and admissions on

24    file, together with the affidavits, if any.  Rule 56(c); <u>see also</u> <u>In</u>

25    <u>re Citric Acid Litigation</u>, 191 F.3d 1090, 1093 (9th Cir. 1999).  The

26    evidence of the opposing party is to be believed, <u>see Anderson</u>, 477

1  U.S. at 255, and all reasonable inferences that may be drawn from the

2  facts placed before the court must be drawn in favor of the opposing

3  party, see Matsushita, 475 U.S. at 587 (citing United States v.

4  Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)). See also

5  Headwaters Forest Def. v. County of Humboldt, 211 F.3d 1121, 1132 (9th

6  Cir. 2000). Nevertheless, inferences are not drawn out of the air,

7  and it is the opposing party's obligation to produce a factual

8  predicate from which the inference may be drawn. See Richards v.

9  Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985),

10  aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

11      Finally, to demonstrate a genuine issue, the opposing party

12  "must do more than simply show that there is some metaphysical doubt

13  as to the material facts. . . . Where the record taken as a whole

14  could not lead a rational trier of fact to find for the nonmoving

15  party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S.

16  at 587 (citation omitted).

17                    **III. Analysis**

18      Plaintiff moves for summary judgment against defendant Haria and

19  Gogri Corp, seeking damages under state law and injunctive relief

20  under the ADA. With respect to damages, defendant argues that, in

21  light of recent California case law, proof of intent to discriminate

22  on the basis of disability is required for damages under section 52(a)

23  of the Unruh Act. With respect to injunctive relief, defendant

24  contends that the alleged violations have either been remedied or

25  would cost too much to remedy, and that the alleged violations do not

26  render the restaurant or its facilities inaccessible. For the reasons

7

1   set forth below, plaintiff's motion is granted.

2   **A. ADA Claim**

3      Title III of the ADA prohibits discrimination against people

4   with disabilities in places of public accommodation.  42 U.S.C. §

5   12182(a).  One form of such discrimination is the failure to remove

6   architectural barriers.  24 U.S.C. § 12182(b)(2)(A)(iv).  In order to

7   prove discrimination stemming from an architectural barrier, plaintiff

8   must demonstrate that (1) he is disabled, (2) the facility in question

9   is a place of public accommodation, (3) the facility contains an

10   architectural barrier, (4) the plaintiff had actual knowledge of the

11   architectural barrier precluding his full and equal access to the

12   facility.  42 U.S.C. §§ 12182(a), 12182(b)(2)(A)(iv), 12188(a).

13      There is little dispute that most of these elements are present

14   in the case at bar.  First, given that plaintiff is unable to walk

15   without the use of a mobility aid (e.g., wheelchair or cane), there is

16   no genuine dispute that he is disabled within the meaning of the ADA.[6]

17   See 42 U.S.C. § 12102(2)(A) (defining disability as a physical or

18   mental impairment that substantially limits a major life activity).

19   Second, a restaurant is a place of public accommodation.  42 U.S.C. §

20   12181(7)(B).  Third, assuming the alleged architectural barriers

21

22      [6] The fact that defendant asserts that plaintiff was observed walking without the aid of a cane or wheelchair on one occasion is

23 not sufficient to create a genuine dispute regarding this issue. Gogri Decl. ¶ 11.  Such an event would not negate the fact that

24 plaintiff's numerous medical conditions nevertheless constitute a substantial limitation on his ability to walk.  See 29 C.F.R. §

25 1630.2(j) (defining substantial limitation as either a total inability to perform major life activity or a significant

26 restriction on the same).

8

1  exist, plaintiff satisfies the requirement of actual knowledge, given

2  that he personally encountered them during his multiple visits to the

3  restaurant.  Fourth, while defendant would ordinarily be entitled to

4  prove that the removal of the alleged architectural barriers is not

5  "readily achievable" (given that the facility was in existence prior

6  to the passage of the ADA in 1993), the court holds that this is an

7  affirmative defense, which defendant has waived.[7]  Accordingly, the

8  only remaining issue is whether the architectural barriers alleged by

9  plaintiff were in place during his visits, and whether they continue

10  to exist.

11  ///

12

13      [7] The Ninth Circuit has yet to rule on this issue, but courts
    are generally in agreement that whether barrier removal is readily
14  achievable  is  an  affirmative  defense.   See  Colorado  Cross
    Disability Coalition v. Hermanson Family Ltd. P'ship, 264 F.3d 999,
15  1002-03 (10th Cir. 2001); Gathright-Dietrich v. Atlanta Landmarks,
    Inc., 452 F.3d 1269, 1274 (11th Cir. 2006).  See also Lentini v.
16  Calif. Ctr. for the Arts, 270 F.3d 837 (9th Cir. 2004) (holding
    that whether an accommodation "fundamentally alters" a service or
17  facility is an affirmative defense).
        In Colorado Cross, the Tenth Circuit established a burden-
18  shifting framework in which the plaintiff bears in the initial
    burden of production but the defendant bears the ultimate burden
19  of persuasion.  264 F.3d at 1002-03.  The plaintiff must first
    suggest a method of barrier removal and proffer evidence that the
20  method meets the statutory definition of readily achievable.  Id.
    Thereafter, the burden shifts to the defendants to rebut that
21  showing and prove that the suggested method is not readily
    achievable.  Id.
22      Here, defendant has failed to plead that barrier removal is
    not readily achievable in its answer.  Accordingly, the defense is
23  waived.  Enlow v. Salem-Keizer Yellow Cab Co., Inc., 389 F.3d 802, 819
    (9th Cir. 2004).  While plaintiff has not come forward with any
24  evidence regarding barrier removal, he need not do so where such
    evidence would be unnecessary, given defendant's waiver.   In
25  contrast, the Colorado Cross court noted that the defendant in that
    case had properly pled that barrier removal was not readily
26  achievable as an affirmative defense.  Id., n.3.

                                    9

### 1. Cut-Out Curb Ramp

Defendant concedes that the slope of the cut-out curb ramp is in violation of ADAAG § 4.7.2 and 4.8.2.[8] However, it defends this non-compliance on two grounds. First, defendant states, without any accompanying evidence, that fixing the grade "would be several thousand dollars." Gogri Decl. ¶ 11(b). However, as noted above, defendant waived its ability to make this argument when it failed to plead that the barrier removal was not "readily achievable" as an affirmative defense. Second, defendant maintains that the degree of non-compliance is de minimis and did not render the restaurant inaccessible. The argument misapprehends the law. Ultimate access is not a defense under the ADA. See Boemio v. Love's Rest., 954 F. Supp. 204, 208 (S.D. Cal. 1997) ("The standard cannot be 'is access achievable in some manner'. We must focus on the equality of access. If a finding that ultimate access could have been achieved provided a defense, the spirit of the law would be defeated.").

### 2. Restroom Door

There is no genuine dispute that the men's restroom door is inaccessible in several respects. First, there is not a 12-inch strike side clearance on the push side of the door required by ADAAG § 4.13.6. Defendant claims that fixing this violation would cost $70,000 and that it does not render the restroom inaccessible. Both

---

[8] Title III gives the Department of Justice authority to develop regulations implementing the requirements of the ADA. 42 U.S.C. § 12186(b). Pursuant to this authority, the Attorney General adopted the ADA Accessibility Guidelines ("ADAAGs") codified at 28 C.F.R. Pt. 36, Appendix A. See Fortyune v. Am. Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004).

10

1   these arguments are unavailing, for the reasons noted above.  Second,

2   the door pressure required to open the door is 12 pounds, exceeding

3   the 5 pound maximum allowed by ADAAG § 4.13.11.  Defendant has no

4   response to this contention and its accompanying evidence.  Third,

5   plaintiff presents evidence that the door-stop prevents the door from

6   opening to a full 90 degrees.  ADAAG § 4.13.5.  Again, defendant fails

7   to respond to this point.

8           **3. Toilet Paper Dispenser**

9           Plaintiff also provides evidence that the toilet paper dispenser

10  is too far from the back wall.  Specifically, it is 42 inches away,

11  exceeding the maximum 36 inches allowed.  ADAAG § 4.17.3; Fig. 30(d).

12  Wilson Decl. II, ¶ 3(c), Ex. E.  Defendant states that the dispenser

13  was moved and was in compliance as of November 27, 2006.  However,

14  plaintiff visited the restaurant on November 30, 2006, and took

15  pictures of the restroom, placing a measuring tape along the wall to

16  document the distance from the back wall to the dispenser.  There is

17  no genuine dispute that the dispenser location is still in violation.

18          **4. Interior Door Handle of Restroom Door**

19          Plaintiff states that the inside door handle of the restroom

20  door requires tight grasping, pinching, or twisting of the wrist to

21  operate, in violation of ADAAG §§ 4.27.4 and 4.13.9.  Defendant has no

22  response to this, aside from stating that "It is impossible to comply

23  with a Complaint like this since it is so unclear."  Gogri Decl. ¶

24  11(e).  Having failed to produce any evidence, there is no genuine

25  dispute that the door handle is in violation of ADAAG §§ 4.27.4 and

26  4.13.9.

11

1    **5. Signage for Accessible Seating**

2       Defendant concedes that the required signage is often absent,

3    but claims that this is due to constant theft and vandalism.  However,

4    plaintiff's evidence indicates that as of November 30, 2006, after

5    defendant's opposition was filed, the signage was absent, just as it

6    was absent on each of plaintiff's previous visit.  While the court

7    must draw all reasonable inferences in favor of defendant, here, it

8    would be unreasonable for the court to presume that the signage

9    happens to have been stolen all thirteen times that plaintiff can

10   document that he visited the restaurant.  Accordingly, there is no

11   genuine dispute that defendant has violated the relevant ADAAGs

12   regarding required signage.  ADAAG §§ 4.1.2(7), 4.1.16(3), 4.30.3.

13      **6. "No Parking" Painted in Access Aisle**

14      Plaintiff concedes that, at present time, defendant has remedied

15   this problem.  Accordingly, the motion with regard to this issue is

16   moot.

17      In sum, the court finds that there is no genuine dispute that

18   plaintiff has satisfied all the elements of his ADA claim with respect

19   to all five of the outstanding architectural barriers described above

20   that have yet to be removed.  Accordingly, the motion for summary

21   judgment for the ADA claim is granted.

22   **B. State Law Claims**

23      Plaintiff also moves for summary judgment with respect to his

24   state law cause of action under the Unruh Act and the Disabled Persons

25   Act ("DPA"), and seeks damages under the former.  Both statutes

26   incorporate the ADA by reference.  The Unruh Act was amended in 1992

12

1    to include the following language (now codified at Cal. Civ. Code §

2    51(f)): "A violation of the right of any individual under the

3    Americans with Disabilities Act of 1990 (Public Law 101-336) shall

4    also constitute a violation of this section." One critical difference

5    between the ADA and the Unruh Act, however, is the available remedy.

6    The Unruh Act provides for a minimum damages of $4,000 per violation,

7    Cal. Civ. Code § 52(a), while the only remedy available under Title

8    III of the ADA is injunctive relief, 42 U.S.C. § 12188(a)(1).  Under

9    the ADA, damages are not recoverable.  Wander v. Kaus, 304 F.3d 856,

10   858 (9th Cir. 2002).

11       Here, defendant argues that in order to obtain damages

12   authorized by the Unruh Act, plaintiff must demonstrate that defendant

13   had an intent to discriminate.  The argument is premised upon a recent

14   California intermediate appellate court decision, Gunther v. Lin, 50

15   Cal. Rptr. 3d 317 (Cal. Ct. App. 2006), which was decided after

16   plaintiff's motion was filed.[9]  Where the highest court of a state has

17   not pronounced upon an issue of state law, as is the case here, a

18   federal court sitting in diversity must use its own best judgment to

19   predict how that court would decide the issue.  Takahashi v. Loomis

20   Armored Car Serv., 625 F.2d 314, 316 (9th Cir. 1980).

21       In conducting this analysis, a federal court looks to guidance

22   from state appellate court opinions, well-reasoned decisions from

23   other jurisdictions, and treatises.  U.S. v. Colin, 314 F.3d 439, 443

24   (9th Cir. 2002).  Because a federal court must take into account "all

25   _____

       [9] The California Supreme Court denied the petition for review
26   on January 17, 2007.

                                13

1    available data," Estrella v. Brandt, 682 F.2d 814, 817 (9th Cir.

2    1982), the decision of a California intermediate appellate court is

3    not controlling.  Dimidowich v. Bell & Howell, 803 F.2d 1473, 1482

4    (9th Cir. 1986) ("'[D]ecisions by California Courts of Appeal are

5    merely data'") (quoting Am. Sheet Metal, Inc. v. EM-KAY Eng'g Co., 478

6    F. Supp. 809, 813 (E.D. Cal. 1979) (Karlton, J.)).  Of course, such a

7    decision "is not to be disregarded by a federal court unless it is

8    convinced by other persuasive data that the highest court of the state

9    would decide otherwise."  Estrella, 682 F.2d at 817.

10        **1. Prior Ninth Circuit Law**

11        As a threshold matter, the court notes that the holding of

12   Gunther directly contradicts that of Lentini v. Calif. Ctr. for the

13   Arts.  270 F.3d 837 (9th Cir. 2004).  There, the Ninth Circuit held

14   that because plaintiffs need not prove discriminatory intent under the

15   ADA, plaintiffs also need not prove discriminatory intent under the

16   Unruh Act, which imported ADA standards of liability.  Id. at 847.

17   This holding was in accord with the extant case law at the time, which

18   also held that intent was not required.  See, e.g., Presta v.

19   Peninsula Corridor Joint Powers, 16 F. Supp. 1134, 1135 (N.D. Cal.

20   1998) ("Because the Unruh Act has adopted the full expanse of the ADA,

21   it must follow, that the same standards for liability apply under both

22   Acts.").

23        Gunther's holding raises the issue for district courts

24   as to whether they are bound by Lentini or are now obligated to

25   reconsider the matter in light of the subsequent opinion by an

26   intermediate court of the state.  The state of the law is less

14

1   than clear.  In In re Watts, the Ninth Circuit held that an

2   intervening decision by an intermediate court requires that

3   court to reconsider a previous contrary opinion.  In re Watts,

4   298 F.3d 1077, 1083 (9th Cir. 2002).  This does not answer the

5   question of whether a district court is free to disregard the

6   Circuit's previous opinion, a question which has divided courts

7   around the country.[10]  Happily, this court need not answer that

8   question.[11]  Whatever else is true, it is clear that federal

9   courts are free to disregard the decisions of intermediate state

10  courts where there is "convincing evidence" that the state's

11  highest court would decide differently.  In re Watts, 298 F.3d

12  at 1083.  Here, there is convincing evidence suggesting that the

13  decision is not likely the law of the state of California.[12]

14  _____

15       [10] Compare In re E&S Dist. Asbestos Litig., 772 F. Supp. 1380,
    1391 (S.D.N.Y. 1991), Wankier v. Crown Equip. Corp., 353 F.3d 862,
    866 (10th Cir. 2003), Aceto v. Zurich Ins. Co., 440 F.2d 1320,1322

16  (3rd Cir. 1971), and Nussbaum v. Mortgage Serv. America Co., 913 F.
    Supp. 1548, 1554 (S.D. Fla. 1995) with Taco Bell Corp. V. Cont'l Cas.

17  Co., 388 F.3d. 1077-79 (7th Cir. 2004).

18       [11] The problem is particularly troublesome in California.  I
    have previously noted the relative weakness of the doctrine of

19  stare decisis in California jurisprudence.  See Froyd v. Cook, 681
    F. Supp. 669, 672 n.9 (E.D. Cal. 1988).  There, after examining the

20  status of the doctrine within the state, I observed that a "federal
    district court need give no greater weight to intermediate

21  appellate decisions than the superior court of the state does."
    Id.; see also Ortland v. County of Tehama, 939 F. Supp. 1465, 1468

22  (E.D. Cal. 1996).  I am not aware of any change in California law
    bearing upon the issue.

23

24       [12] This is so even though the California Supreme Court denied
    review in Gunther.  Denial of review is "not [] without

25  significance," but review may be denied for any number of reasons
    (including, for instance, the fact that there is not yet an

26  appellate district split on an issue), and it does not necessarily
    signal the California Supreme Court's approval of a particular

1        2. **Gunther**

2            In short, <u>Gunther</u> held what every other court before it has

3    rejected: that proof of intent is required to collect damages for

4    disability discrimination under the Unruh Act, which authorizes a

5    minimum of $4,000 per violation.    50 Cal. Rptr. 3d at 325; Cal. Civ.

6    Code § 52(a).    The court reached this conclusion by interpreting the

7    1992 legislation that amended the Unruh Act to include disability

8    discrimination.    Specifically, it found that this legislation did not

9    overrule <u>Harris v. Capital Growth Investors XIV</u>, 52 Cal. 3d 1142, 1172

10   (1991), which, in rejecting a disparate impact theory of sex

11   discrimination, noted that the statute's language (e.g., "denies,"

12   "aids or incites a denial," "make any discrimination," and "offense")

13   appeared to cover only intentional discrimination.    This language was

14   not altered by the 1992 legislation.

15           Conceptually, then, <u>Gunther</u> envisions a two-step process for

16   obtaining damages: first, the plaintiff must prove that the defendant

17   engaged in discrimination, Cal. Civ. Code § 51, and second, that the

18   discrimination was intentional, Cal. Civ. Code § 52.    According to

19   <u>Gunther</u>, the 1992 legislation altered the first step (by expanding the

20   class of prohibited discrimination to include disability

21   discrimination) but did nothing to alter the second step.

22           <u>Gunther</u>'s reasoning is flawed from the outset.    Its conclusion

23   is premised on the view that the Unruh Act is comprised only of

24   Section 51, but this divorces the law from its enforcement provision

25   _____

26   case.    <u>DiGenova v. State Bd. of Educ.</u>, 57 Cal. 2d 167, 178 (1962).

16

1  in Section 52.  While <u>Gunther</u> notes that, by its own terms, the Unruh

2  Act comprises only Section 51, the case that <u>Gunther</u> cites for this

3  proposition goes on to say that courts "have consistently described as

4  Unruh Civil Rights Act claims causes of action based under seemingly

5  related provisions set forth in sections of the Civil Code that follow

6  section 51." <u>Gatto v. County of Sonoma</u>, 98 Cal. App. 4th 744, 756

7  (2002).  Indeed, even the <u>Harris</u> court referred to the Unruh Act as

8  encompassing the enforcement provision found in Section 52.  52 Cal.

9  3d at 1172 (referring to Section 52 as "the language of the Act").[13]

10  Accordingly, when the 1992 legislation made a violation of the ADA a

11  per se violation of the Unruh Act, it also intended that these victims

12  of disability discrimination would be entitled to the remedies

13  afforded in the enforcement provision.

14          **a. Plain Meaning**

15          The traditional rules of statutory construction compel the same

16  conclusion.  The first step of statutory construction is to assign the

17  "usual and ordinary meanings" to the words of a statute.  <u>Wells v.</u>

18  <u>One2One Learning Found.</u>, 29 Cal. 4th 1164, 1170 (2006).  "If the words

19  themselves are not ambiguous, we presume the Legislature meant what it

20  said, and the statute's plain meaning governs."  <u>Id.</u>

21          Here, the language of the 1992 legislation, codified in (now)

22  Section 51(f), could not be clearer: "A violation of any right of any

23  individual under the [ADA] shall also constitute a violation of this

24  
_____

25          [13] Furthermore, as discussed below, the legislative history to
    Section 51(f) also indicates that the legislature viewed the Unruh
26  Act as comprising both Sections 51 and 52.

1   section." As noted above, "this section" refers to the Unruh Act,

2   including its enforcement provision in Section 52.  Every court to

3   have considered the issue with the exception of <u>Gunther</u> has read

4   Section 51(f) as not requiring proof of intent.  <u>See</u>, <u>e.g.</u>, <u>Lentini</u>,

5   370 F.3d at 847; <u>Presta</u>, 16 F. Supp. 2d at 1136; <u>Hubbard v. Twin Oaks</u>

6   <u>Health and Rehabilitation Ctr.</u>, 408 F. Supp. 2d 923, 928-99 (2004)

7   (Karlton, J.); <u>Boemio</u>, 954 F. Supp. at 208.

8          **b. Legislative History**

9          The legislative history of Section 51(f) reveals an intent to

10  include unintentional disability discrimination within the scope of

11  the Unruh Act.  The Assembly Committee on Judiciary report on AB 1077

12  (as amended January 2, 1992, p.2) stated that the bill would: "Make a

13  violation of the ADA a violation of the Unruh Act.  Thereby providing

14  persons injured by a violation of the ADA with the remedies provided

15  by the Unruh Act (e.g., right of private action for damages)."  The

16  description in the Senate Committee on Judiciary report on AB 1077 (as

17  amended June 1, 1992, p. 5) expressed a similar view.[14]

18         Also of particular significance is a letter from a labor law

19  advisor for the California Chamber of Commerce to the bill's author

20  which stated that the proposed bill would expose operators of places

21  of public accommodations "to greater liability [than the ADA], even

22  for unintentional violations of the new federal standard."  <u>Gunther</u>,

23  50 Cal. Rptr. 3d at 337 (quoting letter from Malanie Wiegner, Labor

24  _____

25  [14] "[T]his bill would make a violation of the ADA a violation of the
    Unruh Act.  Thereby providing persons injured by a violation of the ADA
    with the remedies provided by the Unruh Act (e.g., right of private
26  action for damages, including punitive damages)."

18

1  Law Advisor, California Chamber of Commerce, to Honorable Bruce

2  Bronzan, dated June 1, 1992, at page 2).

3     <u>Gunther</u> sweeps this letter aside.  The court argues that the

4  Disabled Persons Act "does indeed [] allow for greater liability for

5  the ADA than the ADA itself allows."  <u>Id.</u> at 337.  But, quite

6  obviously, the legislature was voting on changes to the Unruh Act, not

7  the DPA, and the letter was referring to the higher liability imposed

8  by the former, not the latter.  Of course, a lone letter is not

9  controlling, but, as the only piece of legislative history to squarely

10  address the issue of intent, it is nonetheless extremely relevant.

11  And it is certainly more relevant than the inference <u>Gunther</u> attempts

12  to draw from the "little opposition" that the bill drew from business

13  groups.  <u>Id.</u> at 337.

14      As the court in <u>Cross</u> recently noted in a post-<u>Gunther</u> decision,

15  "the result under <u>Gunther</u> [] leaves a successful ADA plaintiff without

16  a corresponding Unruh Act remedy [and] undermines the California

17  legislature's purpose in passing section 51(f) to provide that a

18  violation of the ADA is also a violation of the Unruh Act."  <u>Cross v.</u>

19  <u>Pac. Coast Plaza Invs., L.P.</u>, 2007 U.S. Dist. LEXIS 16138, *15 (S.D.

20  Cal. Mar. 6, 2007).  Like the court in <u>Cross</u>, this court also

21  "presumes that the California legislature did not intend section 51(f)

22  to be a law that is all bark and no bite."[15]  <u>Id.</u>, at *15-16.

23  ─────────────────

24     [15]  The court in <u>Cross</u> ultimately declined to exercise
   supplemental jurisdiction over plaintiff's Unruh Act claims in the
   interests of comity.  Here, however, and in contrast to <u>Cross</u>,

25  defendants have not filed a motion to dismiss the supplemental
   state law claims.  Furthermore, the court finds that the issue of

26  state law presented by the instant action is not particularly novel

1              c. **Liberal Construction**

2         If the language of the Section 51(f) were ambiguous, and the

3    legislative history unclear -- which they are not -- the California

4    Supreme Court has also held that the Unruh Act must be interpreted "in

5    the broadest sense reasonably possible" in order to "banish

6    [discriminatory] practices from California's community life."

7    Isbister v. Boys' Club of Santa Cruz, Inc., 40 Cal. 3d 72, 76 (1985);

8    see also Presta, 16 F. Supp. at 1136; Burks v. Poppy Constr. Co., 57

9    Cal. 2d 463, 468 (1962).  If this statement is to have any force

10   beyond mere rhetoric, it must be applied to situations such as this

11   one, where a court might construe a statute in two different ways, one

12   narrow and one broad.

13        Moreover, liberal construction of the Unruh Act is needed to

14   banish the discriminatory practices at issue here.  As Judge Henderson

15   recognized in Presta, disability discrimination is simply different

16   than other forms of discrimination.  "Combating discrimination as it

17   affects persons with disabilities requires recognizing . . . that

18   often the most damaging instances in which rights of persons with

19   disabilities are denied come not as the result of malice or

20   discriminatory intent, but rather from benevolent inaction when action

21   is required."  16 F. Supp. 2d at 1136.  See also Boemio, 954 F. Supp.

22   at 208 n.4.

23        As discussed below, there is an obvious practical connection

24   between the availability of the $4,000 damage minimum and the

25   _____

26   or complex in light of the overwhelming body of case law finding
     that proof of intent is not required.

                                   20

1    enforcement of the ADA.  Second, injunctive relief was already

2    available in 1992, when the Unruh Act was amended to include

3    disability discrimination.  Because of the "sweeping" coverage of

4    California's Unfair Competition Law, see Wilner v. Sunset Life Ins.

5    Co., 78 Cal. App. 4th 952, 964 (2000), injunctive relief for ADA

6    violations was already available under state law.  Accordingly, if

7    this court were to follow Gunther, it would nullify the 1992

8    legislation, and it is clear that courts may not conclude that the

9    legislature engaged in an idle gesture.  Viking Pools v. Maloney, 48

10   Cal. 3d 602, 609 (1998).

11          d. Other Canons of Statutory Construction

12          Gunther also relies upon three canons of statutory construction:

13   avoidance of statutory redundancy/nullification, the rule of

14   reasonable construction, and legislative acquiescence.  50 Cal. Rptr.

15   4th at 327-33, 338-39.  As explained below, the court finds that none

16   of these canons alters the conclusion that the Unruh Act covers

17   unintentional ADA violations.

18              i. Avoiding Statutory Redundancy/Nullification

19          First, Gunther argues that if the Unruh Act were read to include

20   unintentional ADA violations, it would nullify the DPA or render it

21   redundant.  The DPA has been interpreted to authorize damages of no

22   less than $1,000 per violation, even where no intent to discriminate

23   is shown.  See Donald v. Café Royale, 218 Cal. App. 3d 168, 177 1990).

24   According to Gunther, "the two statutes [the Unruh Act and the DPA]

25   dovetail nicely.  Where there is intentional discrimination, there is

26   a four times larger minimum penalty; if there isn't, plaintiff still

21

1  recovers, but less." <u>Gunther</u>, 50 Cal. Rptr. 3d at 331.

2      I cannot agree. The DPA and the Unruh Act are inevitably

3  redundant in some respects, no matter how the court construes the

4  latter.[16] <u>Gunther</u> characterizes the DPA as covering only unintentional

5  discrimination, and the Unruh Act as covering only intentional

6  discrimination, but such is not the case. Rather, the DPA authorizes

7  damages for both intentional and unintentional discrimination, because

8  intent is simply irrelevant under the statute. See <u>Café Royale</u>, 218

9  Cal. App. 3d at 177 ("Viewing the statute reasonably and in a

10  commonsense fashion compels the conclusion that no intent element is

11  set forth."). Accordingly, the portion of the DPA covering

12  intentional discrimination is inevitably redundant with the portion of

13  the Unruh Act covering intentional discrimination.[17]

14              **ii. Rule of Reasonable Construction**

15      Second, <u>Gunther</u> argues that the rule of reasonable construction

16  also points toward adopting its interpretation of the Unruh Act. <u>Id.</u>

17  ───────────────

18  [16] At the same time, it is not clear that the two prohibit the
    same class of conduct, and it is possible that the DPA prohibits
    a smaller category of discrimination tied to physical places. The
19  Unruh Act entitles all individuals to "full and equal
    accommodations, advantages, facilities, privileges, or services in
20  all business establishments of every kind whatsoever." Cal. Civ.
    Code § 51. By contrast, the DPA's language is narrower. It
21  provides disabled people "with the same right as the general public
    to the full and free use of the streets, highways, sidewalks,
22  walkways, public buildings, medical facilities, including
    hospitals, clinics and physicians' offices, public facilities and
23  other public places." Cal. Civ. Code § 54(a). Accordingly, it is
    an open question whether the DPA covers discrimination unconnected
24  to a physical location, as in insurance discrimination, or
    discrimination on the internet.

25
    [17] Furthermore, as noted above, the <u>Gunther</u> court's
26  interpretation also risks nullifying Section 51(f).

                            22

1   at 338.   See Copley Press, Inc. v. Superior Court, 39 Cal. 4th 1272,

2   1291 ("To the extent [] examination of statutory language leaves

3   uncertainty, it is appropriate to consider the consequences that will

4   flow from a particular interpretation") (internal quotation marks

5   omitted).   Gunther argues that its interpretation is the more

6   reasonable one for two reasons.   First, it purportedly avoids

7   redundancy, an issue addressed above.   50 Cal. Rptr. 3d at 338.

8   Second, it allegedly avoids the "gross abuses of the judicial system"

9   that have been caused by an interpretation of the Unruh Act embracing

10   monetary liability for unintentional ADA violations (e.g., the Ninth

11   Circuit's holding in Lentini).   Id.

12        Gunther argues that ADA litigation has been spurred by the

13   minimum $4,000 penalty for "unintentional technical violations of the

14   ADAAGS" and cites with approval the lamentation of one district court

15   that "[d]espite the important mission of the ADA, there are those

16   individuals who would abuse its private cause of action provision by

17   filing lawsuits solely with the intent to profit financially."   Id.

18   (internal quotation marks omitted).[18]

19        As an initial matter, the fact that the Unruh Act contains a

20   damages provision that happens to provide an incentive for its

21   enforcement hardly lends support for a claim that the law is being

22   undermined.   Because insufficient public resources have been invested

23   in enforcing the law, and in educating the public about the ADA, this

24

25        [18] One cannot but help noting the pious recognition of the
     statute's salutary purpose before each deprivation of a benefit
26   under the statute.

23

1 task has been left to private parties and their attorneys.  It would

2 be fundamentally unfair to, on the one hand, deny disabled people the

3 benefit of public enforcement, while, on the other, deprive them of an

4 incentive for their efforts at private enforcement.[19]

5   Furthermore, there is no basis in law for distinguishing between

6 "real" violations of the ADA and merely unintentional "technical"

7 violations of the ADA.  A court cannot pick and choose which

8 violations it deems serious enough to warrant relief under the Unruh

9 Act.  Presumably, no court would argue that placing a toilet paper

10 dispenser too far for a disabled person to reach with ease -- which is

11 what the defendant in this case did -- is merely a "technical"

12 violation.  The legislature has drawn clear lines with respect to what

13 is legal and what is illegal, and it is not for a court to arbitrarily

14 decide which violations are serious enough to warrant relief.

15      **iii. Legislative Acquiescence**

16   Third, Gunther invokes the doctrine of legislative acquiescence

17 in finding that the legislature did not overrule Harris.  Gunther, 50

18 Cal. Rptr. 3d at 327.  In short, it contends the California

19 legislature is presumed to be aware of prior judicial constructions of

20 statutes.  While the presumption is not conclusive, Harris, 52 Cal. 3d

21 at 1156, it is a factor to be considered.  Here, Gunther argues that

22

23   [19] The court has already held elsewhere that the mere fact
that a person has filed multiple lawsuits does not make him or her
24 a vexatious litigant.  Wilson v. Pier 1 Imports (US), Inc., 411 F.
Supp. 2d 1196, 1200 (E.D. Cal. 2006) ("[T]he number of lawsuits
25 plaintiff has filed does not reflect that he is a vexatious
litigant; rather, it appears to reflect the failure of the
26 defendants to comply with the law.").

1  since the legislature amended the Unruh Act in 1992, but failed to

2  change the language construed by Harris as requiring intent, the

3  legislature approved of the court's judicial construction.

4      The doctrine of legislative acquiescence is of little assistance

5  here.  First, as noted above, the case law prior to Gunther has

6  uniformly held that intent was not required to obtain damages for

7  disability discrimination.  If the legislature had acquiesced to

8  anything, it was that body of case law spanning multiple years, not a

9  few lines from Harris.  Second, even if the court acquiesced to

10 Harris, it is impossible to know which part they acquiesced to.

11 Harris rejected a disparate impact theory of sex discrimination for

12 multiple reasons, including, for example, the fact that there was no

13 language or history to suggest that the legislature envisioned

14 disparate impact as a viable claim, and that federal decisions at that

15 time were in conflict as to the availability of that claim.  52 Cal.

16 3d at 1172-73.

17     Finally, Gunther's discussion of legislative acquiescence is

18 circular.  Application of the doctrine serves to reinforce Gunther's

19 interpretation of the statute only if one accepts, as a starting

20 point, that the text of the statute does not evince an intent to

21 authorize damages for unintentional ADA violations.  In other words,

22 if one were to construe Section 51(f) as authorizing damages for

23 unintentional ADA violations based on its language, as the courts did

24 in Lentini and Presta, it would make no sense to say that the

25 legislature acquiesced to a judicial construction entirely contrary to

26 what it in fact intended.

25

1     In sum, the court concludes that a plaintiff may obtain damages

2  under the Unruh Act for violations of the ADA even without a showing

3  of intentional discrimination.  In light of both the legislative

4  history of the statute, and the directive to interpret the statute as

5  broadly as possible to effectuate its purposes, the court finds that

6  Gunther does not control.  Accordingly, the relief requested is hereby

7  granted, and plaintiff is entitled to $52,000 for defendant's thirteen

8  violations of the Unruh Act.

9                   **IV. Conclusion**

10     The motion for summary judgment is granted as to the ADA claim

11  and the Unruh Act claim.

12     IT IS SO ORDERED.

13     DATED:  March 22, 2007.

14

15

16

17

18

19

20

21

22

23

24

25

26

Exhibit F

1
2
3
4
5
6
7
8
9

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

10  DIANE CROSS,                                 )    Civil No. 07cv486 J (LSP)
                                                 )
11              Plaintiff,                       )    **ORDER:**
                                                 )
12       v.                                      )    **(1) DENYING DEFENDANTS'**
                                                 )    **MOTION FOR AN EVIDENTIARY**
13  BOSTON MARKET CORP., et al.,                 )    **HEARING ON THE ISSUE OF**
                                                 )    **PLAINTIFF'S ARTICLE III**
14              Defendants.                       )    **STANDING;**
                                                 )
15                                               )    **(2) GRANTING DEFENDANTS'**
                                                 )    **MOTION TO DISMISS**
16                                               )    **PLAINTIFF'S SUPPLEMENTAL**
                                                 )    **STATE LAW CLAIMS;**
17                                               )
                                                 )    **(3) DENYING DEFENDANTS'**
18                                               )    **MOTION TO DISMISS PURSUANT**
                                                 )    **TO FEDERAL RULE OF CIVIL**
19                                               )    **PROCEDURE 12(b)(6);**
                                                 )
20                                               )    **(4) DENYING DEFENDANTS'**
                                                 )    **MOTION FOR A MORE DEFINITE**
21  _____     )    **STATEMENT.**

22          Before the Court are Defendants Valvista South, LLC and Valvista North, LLC's

23  ("Defendants") Motion for an Evidentiary Hearing on the Issue of Plaintiff's Article III

24  Standing, Motion to Dismiss Supplemental State Law Claims, Motion to Dismiss Pursuant to

25  Federal Rule of Civil Procedure 12(b)(6), and Motion for a More Definite Statement. [Doc. No.

26  38.] Co-defendants Krausz Companies, Inc., Krausz Vista, LLC, Krausz Vista Two, LLC,

27  Boston Market Corporation, System Capital Real Property Corporation, Michaels Stores Inc.,

28  Anna's Linens Inc., Petsmart Inc., and Vista P.S., LLC join in the motions. [Doc. Nos. 42, 45,

1

# EXHIBIT F

07cv486 J (LSP)

1    46, 49, 56.] Plaintiff Diane Cross ("Plaintiff") has filed an opposition. [Doc. No. 55.] The

2    issues presented are decided without oral argument. *See* S.D. Cal. Civ. R. 7.1.d.1 (2006).  For

3    the reasons set forth below, the Court: (1) **DENIES** Defendants' Motion for an Evidentiary

4    Hearing on the Issue of Plaintiff's Article III Standing; (2) **GRANTS** Defendants' Motion to

5    Dismiss the Supplemental State Law Claims; (3) **DISMISSES** without prejudice all of

6    Plaintiff's state claims; (4) **DENIES** Defendants' Motion to Dismiss Pursuant to Federal Rule of

7    Civil Procedure 12(b)(6); (5) **DENIES** Defendants' Motion for a More Definite Statement.

8                                    ***Background***

9         This is a disability discrimination case alleging that architectural barriers at various retail

10   establishments located within the North County Square Shopping Center ("Shopping Center")

11   violate federal and state law by preventing Plaintiff, an alleged disabled individual, from

12   enjoying full and equal access to public accommodations. (*See generally* Compl.)  Plaintiff

13   brings claims arising under the Americans with Disabilities Act ("ADA"), the California Unruh

14   Civil Rights Act ("Unruh Act"), the California Disabled Persons Act ("DPA"), and the Health

15   and Safety Code. (*See generally id.*)

16        Plaintiff alleges that she is a paraplegic and therefore "physically disabled" within the

17   meaning of federal and state law. (*Id.* ¶ 17.)  Defendants Valvista South, LLC and Valvista

18   North, LLC currently own portions of the Shopping Center. (Mot. to Dismiss at 2.)  Defendants

19   did not acquire ownership rights in portions of the Shopping Center until January 26, 2007,

20   approximately two months before Plaintiff filed this action. (*Id.* at 3.)

21        Plaintiff alleges that during a visit to Defendants' properties, she encountered barriers that

22   prevented her from enjoying full and equal access to the facilities located thereon and deterred

23   her from returning. (Compl. ¶ 28.)  Plaintiff seeks relief in the form of damages, injunctive and

24   declaratory relief, and attorney's fees and costs. (*See generally* Compl.)

25   //

26   //

27   //

28   //

1                                     ***Discussion***

## I. Defendants' Motion for an Order Setting an Evidentiary Hearing on the Issue of Plaintiff's Article III Standing

       Defendants argue that the Court should set an evidentiary hearing on Plaintiff's Article III standing because Plaintiff has filed more than 65 ADA lawsuits, including similar actions against shopping centers. (*See* Mot. to Dismiss at 13.) In opposition, Plaintiff argues that she has satisfied the standing requirement by alleging in her Complaint that she visited Defendants' properties, encountered barriers therein which denied her full and equal access, and has been deterred from returning. (*See* Opp'n to Mot. to Dismiss at 18.)

### A. Legal Standard

       Article III of the Constitution requires that litigants have standing to invoke the federal court's power. *See Allen v. Wright*, 468 U.S. 737, 750-51 (1984) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.") (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). Lack of Article III standing constitutes a defect in subject matter jurisdiction. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A motion challenging standing is properly presented under Federal Rule of Civil Procedure 12(b)(1). *See id.* ("Because standing . . . pertain[s] to a federal court's subject-matter jurisdiction under Article III, [it is] properly raised in a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1), not Rule 12(b)(6).").

       The party invoking jurisdiction has the burden of establishing standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). To have standing, a plaintiff must satisfy three elements. First, the plaintiff must have "suffered an injury in fact–an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Id.* at 560 (internal quotations and citations omitted). Second, there must be a causal nexus between the alleged injury and the defendant's challenged conduct. *See id.* Third, it must be likely that a favorable decision will redress the injury. *See id.* at 561.

       To establish standing in an ADA action seeking declaratory or injunctive relief, the plaintiff must show (1) that she is threatened with a concrete and particularized legal harm, and

Case 3:08-cv-00356-JSW   Document 12   Filed 03/31/2008   Page 78 of 88
Case 3:07-cv-04087⏤JSW   Document 13-7   Filed 09/26⏤J07   Page 5 of 15
Case 3:07-cv-00486-J-LSP   Document 66   Filed 05/29/2007   Page 4 of 14

1   (2) that there is a sufficient likelihood that she will be harmed again in a similar way. *Bird v.*

2   *Lewis & Clark Coll.*, 303 F.3d 1015, 1019 (9th Cir. 2002); *Wilson v. Costco Wholesale Corp.*,

3   426 F. Supp. 2d 1115, 1119 (S.D. Cal. 2006); *Molski v. Arby's Huntington Beach*, 359 F. Supp.

4   2d 938, 946 (C.D. Cal. 2005).

5       **B. Application**

6       Plaintiff has met her burden to establish standing at the pleading stage. Plaintiff alleges

7   that she visited the stores within the Shopping Center, encountered barriers therein which denied

8   her full and equal access, and has been deterred from returning. (*See* Compl. ¶¶ 27-76.) The

9   Court thus declines Defendants' request to conduct an evidentiary hearing, finding the issue

10  more properly deferred until the summary judgment stage. Defendants nevertheless urge the

11  Court to conduct an evidentiary hearing because Plaintiff has filed more than 65 ADA lawsuits,

12  including similar actions against shopping centers. (*See* Mot. to Dismiss at 13.) At least one

13  district court within the Ninth Circuit has conducted an evidentiary hearing on standing during

14  the pleading stage of an ADA case. *See Molski*, 359 F. Supp. 2d at 941. However, that court did

15  so in light of evidence that the plaintiff's ADA case was being used as a pretext to gain access to

16  the federal courts while pursuing state law remedies, a fact which is absent here. *See id.* at 941

17  n.1. Additionally, even at the summary judgment stage, the number of ADA lawsuits filed is

18  relevant to, but not dispositive of, the issue of whether a plaintiff has standing. *See Wilson*, 426

19  F. Supp. 2d at 1123 (finding that the plaintiff's filing of more than 80 lawsuits throughout

20  California was relevant to but not outcome determinative of a motion for summary judgment);

21  *cf. Molski*, 359 F. Supp. 2d at 948 (finding that the number of lawsuits previously filed by a

22  plaintiff is not relevant to resolving the issue of standing at the pleading stage). Accordingly, the

23  Court **DENIES** Defendants' Motion for an order setting an evidentiary hearing on the issue of

24  Plaintiff's Article III standing.

25  **II. Defendants' Motion to Dismiss Supplemental State Claims**

26      Defendants argue that "because of recent dissension between the state and federal courts

27  on the interpretation of California disability access statutes, this Court should decline

28  supplemental jurisdiction over and dismiss [Plaintiff's] state court claims." (Mot. to Dismiss at

<div align="center">4</div>

<div align="right">07cv486 J (LSP)</div>

1  8.) Defendants note that the California Court of Appeal, in direct conflict with Ninth Circuit

2  precedent, recently held that statutory damage awards under the remedial provisions of

3  California's Unruh Civil Rights Act are not available absent proof of intentional discrimination,

4  even when a defendant is found to have violated the ADA. (*Id.* (citing *Gunther v. Lin*, 144 Cal.

5  App. 4th 223 (2006).) In opposition, Plaintiff argues that the California Court of Appeal's

6  decision is not controlling and is "wrong on the law." (Opp'n to Mot. to Dismiss at 6-11.)

7      Pursuant to 28 U.S.C. § 1367(a), a district court has supplemental jurisdiction over state

8  law claims "that are so related to claims in the action within [the district court's] original

9  jurisdiction that they form part of the same case or controversy under Article III." *See* 28 U.S.C.

10  § 1367(a). However, a court may decline to exercise supplemental jurisdiction over a claim if

11  (1) the claim raises novel or complex state-law issues; (2) the claim "substantially predominates"

12  over the court's original-jurisdiction claims; (3) the court has dismissed all the

13  original-jurisdiction claims; or (4) in "exceptional circumstances" if there are "other compelling

14  reasons" to decline. *See* § 1367(c); *Patel v. Penman*, 103 F.3d 868, 877 (9th Cir. 1996).

15      Here, the Court has original jurisdiction over Plaintiff's ADA claims because they arise

16  under federal law. *See* 28 U.S.C. § 1331. The Court has supplemental jurisdiction over

17  Plaintiff's state law claims so long as they derive from the same nucleus of operative fact as her

18  ADA claims. *See Executive Software N. Am. v. U.S. Dist. Ct.*, 24 F.3d 1545, 1552 (9th Cir.

19  1994) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)). The same facts which

20  give rise to Plaintiff's ADA claims, namely, the alleged barriers at the Shopping Center, give

21  rise to Plaintiff's state law claims. The Court may, however, decline to exercise supplemental

22  jurisdiction over the state law claims if one of the conditions listed in § 1367 is present.

23      Defendants argue that Plaintiff's state law claims raise novel or complex state-law issues.

24  (Mot. to Dismiss at 8.) Specifically, Defendants assert that the California Court of Appeal's

25  application of Unruh Act remedies in *Gunther v. Lin*, 144 Cal. App. 4th 223 (2006), is in direct

26  conflict with the Ninth Circuit's application of the same remedies in *Lentini v. California Center*

27  *for the Arts*, 370 F.3d 837 (9th Cir. 2004). The Court examines these two cases along with the

28

<center>5</center>

1   relevant statutes to determine whether Plaintiff's Unruh Act claims present novel and complex

2   issues of unresolved state law.

3         **A. The Unruh Act and the ADA**

4         The Unruh Act provides in pertinent part:

5         All persons within the jurisdiction of this state are free and equal, and no matter what
          their sex, race, color, religion, ancestry, national origin, disability, medical condition,
6         marital status, or sexual orientation are entitled to the full and equal accommodations,
          advantages, facilities, privileges, or services in all business establishments of every
7         kind whatsoever.

8

9   Cal. Civ. Code § 51(b).  The California Supreme Court held in *Harris v. Capital Growth*

10  *Investors XIV* that "a plaintiff seeking to establish a case under the Unruh Act must plead and

11  prove intentional discrimination in public accommodations in violation of the terms of the Act."

12  *See* 52 Cal. 3d 1142, 1175 (1991); *see also Gunther*, 144 Cal. App. 4th at 233 (stating that

13  statutory damages under the Unruh Act are available only for intentional discrimination).  A year

14  after *Harris* was decided, the California legislature amended the Unruh Act by providing that a

15  violation of the ADA constitutes a violation of the Unruh Act.  *See* Cal. Civ. Code § 51(f) ("A

16  violation of the right of any individual under the Americans with Disabilities Act of 1990 ...

17  shall also constitute a violation of this section.").  A plaintiff need not demonstrate intentional

18  discrimination to establish a violation of the ADA.  *See* 42 U.S.C. § 12182(b)(2)(iv); *Lentini*,

19  370 F.3d at 846-47.  Under California Civil Code § 52(a), which provides for certain remedies

20  for discrimination in violation of the Unruh Act, a plaintiff may recover at least $4,000 for each

21  offense constituting a violation of the Unruh Act.  Cal. Civ. Code § 52(a).[1]  In the instant case,

22  Defendants allege that there is an unresolved issue of state law as to whether a plaintiff may

23  recover statutory damages under California Civil Code § 52(a) for unintentional violations of the

24  ADA.  (*See* Mot. to Dismiss at 8.)  This issue was examined by the Ninth Circuit in *Lentini*, 370

25  F.3d at 847, and the California Court of Appeal in *Gunther*, 144 Cal. App. 4th at 257.

26  _____

27       [1] Specifically, California Civil Code § 52(a) provides that "[w]hoever denies, aids or incites a
     denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each
28   and every offense for the actual damages . . . up to a maximum of three times the amount of actual
     damage but in no case less than four thousand dollars ($4,000)."

**B.** *Lentini* **and** *Gunther*

In *Lentini*, the Ninth Circuit acknowledged that no binding authority exists as to whether a plaintiff can receive statutory damages under the Unruh Act for unintentional violations of the ADA. *See Lentini*, 370 F.3d at 847. After engaging in a brief analysis, the Ninth Circuit found that a plaintiff is not required to demonstrate intentional discrimination to recover damages under the Unruh Act where the violation of the Unruh Act is premised on a violation of the ADA. *See id.* The Ninth Circuit determined that the California Supreme Court's holding in *Harris*, which required a showing of intentional discrimination to recover Unruh Act remedies, did not apply to Unruh Act claims establishing unintentional violations of the ADA. *See id.* The Ninth Circuit concluded that "[t]his result is mandated by the plain meaning of the Unruh Act's language, which states that a violation of the ADA is, per se, a violation of the Unruh Act." *Id.*

In contrast to *Lentini*, the California Court of Appeal in *Gunther* held that statutory damages under the Unruh Act are available only for intentional discrimination. *See* 144 Cal. App. 4th at 257. The court acknowledged that a plaintiff need not demonstrate intentional discrimination to prove an ADA violation, and that Civil Code § 51(f) provides that a violation of the ADA constitutes a violation of the Unruh Act. *Id.* at 227. However, the court found that the plain language of California Civil Code § 52(a), the statutory damages provision of the Unruh Act, provides remedies only for intentional discrimination. *Id.* at 233-34. The court also noted that it was bound by the California Supreme Court's decision in *Harris*, which held that § 52 applies only to intentional discrimination. *Id.* at 238-39. After discussing *Lentini* at length, the court concluded that the Ninth Circuit "basically refused to follow what our own state Supreme Court said in *Harris*" and that "the *Lentini* court's analysis cannot be considered an accurate statement of California law." *Id.* at 252. The court concluded by noting that the plaintiff could have recovered the smaller statutory minimum penalty available under the California Disabled Persons Act for unintentional violations of the ADA, had he elected to do

7

1    so.[2] *See Gunther*, 144 Cal. App. 4th at 257. The California Supreme Court has declined to

2    review *Gunther* and has also declined requests for depublication of the opinion. *See Gunther v.*

3    *Lin*, No. S148359, 2007 Cal. LEXIS 350, at *1 (Jan. 17, 2007).

4         Because there is no direct guidance from the California Supreme Court, and the Ninth

5    Circuit and the California Court of Appeal have reached different conclusions, the Court finds

6    that the remedial provisions of the Unruh Act present novel and complex issues of unresolved

7    state law. If the Court adheres to the Ninth Circuit's approach in *Lentini*, Plaintiff would be able

8    to recover damages under Civil Code § 52 if she establishes a violation of the ADA, even if such

9    violation was unintentional. But if the Court adheres to the California Court of Appeal's

10   approach in *Gunther*, Plaintiff would be able to recover damages under § 52 only if she

11   establishes intentional discrimination. The Court therefore cannot reconcile *Lentini* and

12   *Gunther*. This Court has previously noted that where there is no direct guidance from the

13   California courts, and the federal courts have reached contrary conclusions, an unresolved issue

14   of state law "is better left to the California courts." *Org. for the Advancement of Minorities v.*

15   *Brick Oven Rest.*, 406 F. Supp. 2d 1120, 1130 (S.D. Cal. 2005) (finding that the remedial

16   provisions of the Unruh Act and the DPA presented novel and complex issues of unresolved

17   state law that should be avoided as a matter of comity). Here, federal and state interpretations of

18   the remedial provisions of the Unruh Act have deviated to such a degree that declining

19   supplemental jurisdiction over Plaintiff's Unruh Act claims is appropriate.

20        Plaintiff argues that the Court should retain supplemental jurisdiction because *Gunther* is

21   not controlling authority on the federal courts and was wrongly decided. However, even if the

22   Court assumes that *Gunther* incorrectly interpreted Civil Code § 52, the fact remains that the

23   proper interpretation of this statute is an unresolved issue of state law. Accordingly, the Court

24   **GRANTS** Defendants' motion to dismiss the supplemental state claims. The Court notes that

25   the conflict between *Lentini* and *Gunther* applies only to Plaintiff's Unruh Act claims. However,

26

27        [2] In California, a plaintiff bringing a disability discrimination suit must elect between the larger
     damages provided by the Unruh Act via Civil Code § 52 or the smaller damages provided by the
28   Disabled Persons Act via Civil Code § 54.3. Cal. Civ. Code § 54.3; *Gunther*, 144 Cal. App. 4th at 232.

07cv486 J (LSP)

Case 3:08-cv-00356-JSW    Document 12    Filed 03/31/2008    Page 83 of 88
Case 3:07-cv-04087-␣␣W    Document 13-7    Filed 09/28/␣␣07    Page 10 of 15
Case 3:07-cv-00486-J-LSP    Document 66    Filed 05/29/2007    Page 9 of 14

1  the Court finds that the most efficient course is to also dismiss Plaintiff's DPA and Health and

2  Safety Code claims in order to allow the state court to adjudicate Plaintiff's state claims in their

3  entirety. The Court thus **DISMISSES** without prejudice all of Plaintiff's state claims.

4  **III. Defendants' Federal Rule of Civil Procedure 12(b)(6) Motion to Dismiss**

5        Defendants argue that Plaintiff has failed to state a claim upon which relief may be

6  granted because Defendants "did not fail to design or construct an accessible facility as alleged

7  in [the Complaint]." (Mot. to Dismiss at 10.) Further, Defendants assert that Plaintiff has failed

8  to allege that she visited the property at issue during the relatively brief period in which

9  Defendants have owned it. (*Id.*) In opposition, Plaintiff argues that she has complied with the

10  liberal pleading standards of Federal Rule of Civil Procedure 8 by alleging that Defendant

11  possesses an interest in the subject property, she visited the subject property during the statutory

12  period, and she is deterred from visiting the subject property due to architectural barriers to

13  access. (Opp'n to Mot. to Dismiss at 2, 16.) Because the Court has declined supplemental

14  jurisdiction over Plaintiff's state law claims, the Court need only examine whether Plaintiff's

15  ADA claims survive Defendants' Motion to Dismiss.

16        **A. Legal Standard: Rule 12(b)(6) Motion to Dismiss**

17        Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. *See* Fed. R.

18  Civ. P. 12(b)(6); *see also Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-1200 (9th Cir. 2003).

19  Dismissal of a claim under this rule is appropriate only where it "appears beyond doubt that the

20  plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

21  *Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1061 (9th Cir. 2004) (quoting *Conley v. Gibson*,

22  355 U.S. 41, 45-46 (1957)). A complaint may be dismissed as a matter of law for two reasons:

23  (1) lack of a cognizable legal theory, or (2) insufficient facts under a cognizable theory. *See*

24  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

25        In reviewing the motion, the court must assume the truth of all factual allegations and

26  must construe them in the light most favorable to the nonmoving party. *See Gompper v. VISX,*

27  *Inc.*, 298 F.3d 893, 895 (9th Cir. 2002). However, the court is not bound to accept as true a

28  legal conclusion couched as a factual allegation. *See Papasan v. Allain*, 478 U.S. 265, 286

1  (1986); *see also W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). Instead, the

2  court must determine "whether conclusory allegations follow from the description of facts as

3  alleged by the plaintiff." *Holden v. Hagopian*, 978 F.2d 1115, 1121 (9th Cir. 1992). When

4  ruling on a motion to dismiss, the court may consider the facts alleged in the complaint,

5  documents attached to the complaint, and documents relied upon but not attached to the

6  complaint when authenticity is not contested. *See Cooper v. Pickett*, 137 F.3d 616, 623 (9th Cir.

7  1997).

8    **B. Legal Standard: Title III of the ADA**

9      Pursuant to Title III of the ADA, "[n]o individual shall be discriminated against on the

10  basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

11  advantages, or accommodations of any place of public accommodation by any person who owns,

12  leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

13  Discrimination under Title III includes "a failure to remove architectural barriers . . . where such

14  removal is readily achievable." 42 U.S.C. § 12182(b)(2)(A)(iv). If a defendant can demonstrate

15  that removal of a barrier is not "readily achievable," a public accommodation must make its

16  facilities available through "alternative methods if such methods are readily achievable." 42

17  U.S.C. § 12182(b)(2)(A)(v). Discrimination also includes "a failure to design and construct

18  facilities for first occupancy later than 30 months after [July 26, 1990], that are readily

19  accessible to and usable by individuals with disabilities, except where an entity can demonstrate

20  that it is structurally impracticable." 42 U.S.C. § 12183(a)(1). With respect to a facility that has

21  been altered in a manner that could affect its usability, discrimination includes a failure to make

22  the alterations so that the facility is readily accessible to individuals with disabilities to the

23  maximum extent feasible. 42 U.S.C. § 12183(a)(2). Finally, the ADA requires reasonable

24  modifications in policies or practices to make goods and services available to individuals with

25  disabilities, unless such modifications would fundamentally change the nature of the goods and

26  services. 42 U.S.C. § 12182(b)(2)(A)(ii).

27

28

C. Application

Plaintiff's Complaint cites all of the provisions of the ADA listed above and alleges facts in support of each provision. Plaintiff alleges that she is physically disabled as defined by the ADA. (Compl. ¶ 17.) She further alleges that she visited Defendants' properties and encountered physical and intangible barriers that interfered with her ability to use and enjoy the goods, services, privileges, and accommodations offered at the properties. (*Id.* ¶ 28.) Lists of these barriers are attached to Plaintiff's Complaint as exhibits. (*Id.* Exs. B, E, F, H, and J.) Plaintiff asserts that she is currently deterred from visiting the properties due to the barriers and the future threats of injury presented by these barriers. (*Id.* ¶¶ 36, 51, 56, 66, 76.)

In describing the manner in which Defendants violated the ADA, Plaintiff's Complaint closely tracks the language of the ADA and cites provisions of the statute. For example, Plaintiff claims that Defendants have discriminated against her by failing to provide full and equal access to their facilities. (*See id.* ¶ 230.) Plaintiff alleges that Defendants can easily remove the architectural barriers at its facilities without much difficulty or expense, and that Defendants violated the ADA by failing to remove those barriers. (*See id.* ¶ 233.) Plaintiff asserts that if it was not readily achievable for Defendants to remove barriers at their facilities, Defendants violated the ADA by failing to make goods and services available through alternative methods which were readily achievable. (*See id.* ¶ 234.) Plaintiff states that Defendants' facilities were designed or constructed after January 26, 1992, triggering access requirements under Title III of the ADA. (*See id.* ¶ 235.) Plaintiff also states that Defendants' facilities were modified after January 26, 1992, again triggering Title III's access requirements. (*See id.* ¶ 238.) Finally, Plaintiff alleges that Defendants violated the ADA by failing to make reasonable modifications in policies, practices, or procedures. (*See id.* ¶ 242.)

The Court's recitation of the allegations contained within the Complaint demonstrates that the allegations are not so conclusory or vague as to warrant dismissal. The allegations satisfy the requirements of Federal Rule of Civil Procedure 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A complaint "need only give 'the defendant fair notice of what the plaintiff's claim is and

07cv486 J (LSP)

1   the grounds upon which it rests.' " *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1036

2   (9th Cir. 2006) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Here, Plaintiff identifies the

3   legal authority that serves as the basis for her claims and recites facts in support of her claims.

4   Further, lists of the alleged barriers are attached to the Complaint. (Compl. Exs. B, E, F, H, and

5   J.) Plaintiff's Complaint has provided Defendants with sufficient notice as to what Plaintiff's

6   claims are and the grounds upon which they rest.

7        Defendants argue Plaintiff has failed to state a claim upon which relief may be granted

8   because Defendants "did not fail to design or construct an accessible facility as alleged in [the

9   Complaint]." (Mot. to Dismiss at 10.) However, dismissal of Plaintiff's ADA claims is

10  appropriate only where it appears beyond doubt that she can prove no set of facts in support of

11  her claims which would entitle her to relief. *See Edwards*, 356 F.3d at 1061. Plaintiff's ADA

12  claims are premised on several theories of discrimination, including that Defendants failed to

13  remove architectural barriers, failed to make goods and services available through alternative

14  methods, and failed to modify existing policies and procedures. (*See* Compl. ¶¶ 233, 234, 242.)

15  Even if Defendants are correct in asserting that they did not fail to design or construct an

16  accessible facility, they have failed to show that Plaintiff can prove no set of facts in support of

17  her various other theories of discrimination.

18       Defendants also argue that Plaintiff has failed to allege that she visited the property at

19  issue after it was acquired by Defendants on January 26, 2007. (Mot. to Dismiss at 10.)

20  However, because Defendants currently own the subject properties, the Court finds no

21  requirement that Plaintiff's Complaint allege the dates on which she visited the properties.

22  Plaintiff alleges that Defendants have failed to remove architectural barriers currently existing on

23  the properties, and that she is deterred from visiting the properties because the barriers still exist.

24  (Compl. ¶¶ 36, 122.) The date on which Plaintiff originally visited the properties is not essential

25  to establishing Plaintiff's claims that Defendants' properties still fail to comply with the ADA

26  and that she is currently deterred from returning to the properties. Defendants have not

27  demonstrated that Plaintiff can prove no set of facts in support of her claim that Defendants have

28  failed to remove architectural barriers currently existing on the properties.

Case 3:08-cv-00356-JSW    Document 12    Filed 03/31/2008    Page 87 of 88
Case 3:07-cv-04087-⌣W    Document 13-7    Filed 09/28/⌣07    Page 14 of 15
Case 3:07-cv-00486-J-LSP    Document 66    Filed 05/29/2007    Page 13 of 14

1    In sum, the Court **FINDS** that Plaintiff's Complaint states legally cognizable claims, and

2    those claims are supported by factual allegations. The Court thus **DENIES** Defendants' Motion

3    to Dismiss for failure to state a claim upon which relief may be granted.

4    **IV. Defendants' Motion for a More Definite Statement**

5    Defendants argue that the Court should order Plaintiff to amend her Complaint to provide

6    a more definite statement because they cannot discern from the Complaint the date of Plaintiff's

7    alleged visits to the Shopping Center. (Mot. to Dismiss at 5.) Defendants also argue that

8    because the Complaint asserts a variety of architectural barriers against a variety of defendants,

9    Plaintiff has failed to adequately specify the barriers for which Defendants Valvista South, LLC

10    and Valvista North, LLC are responsible. (*Id.* at 7.) In opposition, Plaintiff argues that the

11    exhibits to her Complaint identify the alleged barriers currently existing on each property at

12    issue. (Opp'n to Mot. to Dismiss at 5.) Plaintiff also argues that the information Defendants

13    seek in their Motion for a More Definite Statement is readily obtainable through discovery. (*Id.*

14    at 2.)

15    Motions for a more definite statement are generally viewed with disfavor and are rarely

16    granted. *Cellars v. Pac. Coast Packaging, Inc.*, 189 F.R.D. 575, 578 (N.D. Cal. 1999). The test

17    in evaluating a motion under Rule 12(e) is whether the complaint provides the defendant with a

18    sufficient basis to frame a responsive pleading. *Fed. Sav. & Loan Ins. Corp. v. Musacchio*, 695

19    F. Supp. 1053, 1060 (N.D. Cal. 1988). Generally, the court will require a more definite

20    statement only when the complaint is so vague that the opposing party cannot respond, even with

21    a simple denial, in good faith or without prejudice to himself. *See Bureerong v. Uvawas*, 922 F.

22    Supp. 1450, 1461 (C.D. Cal. 1996) ("[A] motion for a more definite statement should not be

23    granted unless the defendant literally cannot frame a responsive pleading."). If the information

24    sought by the moving party would be available through discovery, the motion should be denied.

25    *Doe v. Hagee*, 473 F. Supp. 2d 989, 995 (N.D. Cal. 2007); *United States v. Sequel Contractors,*

26    *Inc.*, 402 F. Supp. 2d 1142, 1147 (C.D. Cal. 2005); *Gay-Straight Alliance Network v. Visalia*

27    *Unified Sch. Dist.*, 262 F. Supp. 2d 1088, 1099 (E.D. Cal. 2001).

28

PROOF OF SERVICE BY MAIL

**RE:**  **Yates v. Unicorn Pan Pacific Cuisine**
**ND California Federal District Court, Case No. C080356 JSW**

H. Paul Bryant certifies and declares as follows:

I am over the age of 18 years, and not a party to this action.  My business address is 725 Washington Street, Suite #213, Oakland, California, 94607, which is located in the county where the mailing described below took place.

I am readily familiar with the business practice at my place of business for collection and processing of correspondence for mailing with the United States Postal Service.  Correspondence so collected and processed is deposited with the United States Postal Service that same day in the ordinary course of business.

On March 31, 2008, at my place of business at Oakland, California, a copy of the following documents:

**(1) NOTICE OF MOTION FOR COURT TO: (1) DECLINE SUPPLEMENTAL JURISDICTION OVER AND TO DISMISS PLAINTIFF'S STATE LAW CLAIMS [28 U.S.C. § 1367(c)]; AND (2) DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED; [FRCP 12(b)(6)]**

**(2) MOTION FOR COURT TO: (1) DECLINE SUPPLEMENTAL JURISDICTION OVER AND TO DISMISS PLAINTIFF'S STATE LAW CLAIMS [28 U.S.C. § 1367(c)]; AND (2) DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED; [FRCP 12(b)(6)]**

**(3) REQUEST FOR JUDICIAL NOTICE OF DOCUMENTS SUPPORING MOTION FOR COURT TO: (1) DECLINE SUPPLEMENTAL JURISDICTION OVER AND TO DISMISS PLAINTIFF'S STATE LAW CLAIMS [28 U.S.C. § 1367(c)]; AND (2) DISMISS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED; [FRCP 12(b)(6)]**

were served by placing the documents listed above in a sealed envelope with postage thereon fully prepaid, in the United States Mail, at Oakland, California addressed as set forth below :

Thomas E. Frankovich
2806 Van Ness Avenue
San Francisco, California 94109

I certify and declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on March 31, 2008.

H. Paul Bryant

POS